## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

**ULTIMATE OUTDOOR**                        *
**MOVIES, LLC et. al.**
                                            *

    **PLAINTIFFS**                         *    **CIVIL NO.: 1:18-cv-02315-RDB**
**V.**

**FUNFLICKS, LLC, et. al.**                 *

    **DEFENDANTS**                         *

---

## MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER, AND/OR PRELIMINARY INJUNCTION AS TO COUNT VIII (VIOLATION OF 18 U.S.C. SECTION 2511) COUNT X, (15 U.S.C. §1125(1)(A), THE FEDERAL LANHAM ACT) AND COUNT XIII (COMMON LAW UNFAIR COMPETITION)

---

/s/Troy Swanson
Troy C. Swanson
USDC MD Bar #05806
Cipriani & Werner, P.C.
641 Ivy Lane, Suite 600,
Greenbelt, Maryland 20770
Telephone 410-420-0700
Fax #410-420-0222
Email: tswanson@c-wlaw.com
Attorneys for Plaintiffs

# TABLE OF CONTENTS

I        INTRODUCTION                                                              1

II       THE PARTIES                                                               1

III      FACTS RELEVANT TO UOM'S MOTION                                            2

    A    HISTORY OF THE FUNFLICKS BUSINESS, FF DARRELL AND                         2
         UOM

    B    FF DARRELL ATTEMPTS TO RE-NEGOTIATE 2013 NOTE AND                         7
         SECURITY AGREEMENT IN THE FALL OF 2017.

    C    NEGOTIATIONS BETWEEN UOM AND FF HUNTER/DIAS                               8

    D    FF DARRELL AND DARRELL ENTER INTO THE 2018                                9
         SETTLEMENT AGREEMENT WITH MR. SEVERN and FF
         SEVERN.

         FF DARRELL RETAINS THE EXISTING FUNFLICKS
         GOODWILL

    E    UOM OWNS ITS GLOBAL CLIENT LIST.                                          13

    F    FF SEVERN REDIRECTS THE WWW.FUNFLICKS.COM URL TO                          16
         FF HUNTER/DIAS WEB/EMAIL SERVERS.

    G    DEFENDANTS USE COUNTERFEIT EMAILS TO INTERCEPT                            17
         UOM CLIENT MESSAGES INTENDED FOR UOM

IV       ARGUMENT                                                                  22

    A    THE DEFENDANTS VIOLATED THE FEDERAL WIRETAP ACT                           25
         COUNT  VIII (VIOLATION OF 18 U.S.C. SECTION 2511)

    B    THE DEFENDANTS VIOLATED THE FEDERAL LANHAM ACT.                           26
         COUNT X, (15 U.S.C. §1125(1)(A), THE FEDERAL LANHAM ACT)

    C    THE DEFENDANTS VIOLATED THE COMMON LAW TORT OF                            36
         UNFAIR COMPETITION.  COUNT XIII

    D    PLAINTIFF HAS SATISFIED THE REQUIREMENTS FOR A                            37
         TEMPORARY RESTRAINING ORDER AND PRELIMINARY
         INJUNCTION

V        REQUESTED RELIEF.                                                         38

## TABLE OF CASES

*Baltimore Bedding Corp. v. Moses*, 182 Md. 229 (1943) **36**

*Belmora, LLC v. Bayer Consumer Care AG, 819 F.3d 697, 706 (4th Cir. 2013)* **34,35**

*Berry v. Funk*, 146 F.3d 1003 (D.C. Cir. 1998) **29**

*Directv, Inc. v. Powell*, 2006 U.S. Dist. LEXIS 21217 **26**

*Electronics Store, Inc. v. Cellco Partnership*, 127 Md. App. 385, 407, (1999). **36**

*Farm Fresh Direct By a Cut Above, LLC v. Downey*, 2017 U.S. Dist. LEXIS 178190, *17, 2017 WL 4865481 (D. Md. 2017). **35**

*H.B. Halicki Productions v. United Artists Communications, Inc.*, 812 F.2d 1213, 1214 (9th Cir. 1987) **35**

*Hall v. EarthLink Network, Inc*., 396 F.3d  500 (2d Cir. 2005) **27**

*Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d  1072 (N.D. Cal. 2016) **37,38**

*In re Google Inc. Gmail Litig., No. 13-MD-02430-LHK*, 2013 U.S. Dist. LEXIS 172784, at *30 (N.D. Cal. Sep. 26, 2013) **27-29**

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.  109 (2014) **34-35**

*Livewirecyber, Inc. v. Lee,* No. CV 17-00645-AB (ASx), 2017 U.S. Dist. LEXIS 220462, (C.D. Cal. Feb. 10, 2017) **37-38**

*Qualitex Co. v. Jacobson Products* 514 U.S. 159, 162 (1995) **14**

*Sanders v. Robert Bosch Corp.*, 38 F.3d 736 (4th Cir. 1994) **14**

*Shefts v. Petrakis*, No. 10-cv-1104, 2012 U.S. Dist. LEXIS 130542, at *25 (C.D. Ill. Sep. 12, 2012). **28**

*Stuhlbarg Int'l Sales Co. v. John D. Brush Co*., 240 F.3d 832, 841 (9th Cir. 2001) **37**

*United States v. Bode*, No. ELH-12-158, 2013 U.S. Dist. LEXIS 118627, (D. Md. Aug. 21, 2013) **33**

*United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012)                              **33**

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)                          **31, 33**

*Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205 (2000)                              **34**

*Warshak v. United States*, 490 F.3d 455 (6th Cir. 2007)                              **31**

*In re United States*, 416 F. Supp. 2d 13, 16 (D.D.C. 2006)                          **26**

## STATUTES RULES

15 U.S.C §1116                                **1**

15 U.S.C. §1125                              **34**

18 U.S.C. § 2510                          **25-31**

18 U.S.C. §2520                          **1, 26**

18 U.S.C. §2511                          **25-33**

Fed Civ. P. Rule 65                          **1, 25**

## EXHIBITS

**Exhibit 1**        **UOM Texas Conversion Name Change**

**Exhibit 2**        **Allocation of Purchase Price Exhibit**

**Exhibit 3**        **2013 Security Agreement**

**Exhibit 4**        **Email Routing Diagram**

**Exhibit 5**        **2018 Settlement Agreement**

**Exhibit 6**        **FunFlicks Security Agreements**

**Exhibit 7**        **Landers /Hornacek – Severn Email Exchange**

**Exhibit 8**        **Megan Intercepted E-mail**

**Exhibit 9**        **Megan – Laura Email**

**Exhibit 10**       **Landers /Hornacek – Severn Email Exchange**

## I.    INTRODUCTION

The Defendants, through the FF HUNTER/DIAS web/email servers, counterfeited email addresses used by UOM for the express purpose of intercepting e-mails sent by UOM's customers intended for UOM. Despite a complaint being filed in July 2018, the Defendants are continuing to keep active the UOM e-mails causing immediate and irreparable harm to UOM. Defendants created the ability to intercept hundreds in not thousands of emails from UOM customers with the express purpose of deceiving these customers into believing they are dealing with UOM. The Defendants are continuing to capitalize on their illegal interception and deceit causing irreparable harm to the Plaintiff.

UOM seeks a temporary and/or preliminary injunctive relief against the Defendants pursuant to Fed. R. Civ. Proc.  65, 18 U.S.C. §2520, 15 U.S.C §1116: (1) enjoining the Defendants from intercepting e-mails intended for UOM; (2) enjoining the Defendants from using the e-mail addresses formerly used by UOM and their employees; (3) enjoining the Defendants from using and/or contacting the clients obtained through the interception; and (4) requiring the Defendants to turnover all documentation generated from and pertaining to the intercepted messages.

## II.    PARTIES

1.     PLAINTIFF, Ultimate Outdoor Movies, LLC is a Texas Limited Liability Company with its principal place of business located in Austin, Texas 78759 and is owned by the Plaintiff Laura Landers a/k/a Laura Mauro ("Laura"). UOM is the exclusive licensee of the pending trademark ULTIMATE OUTDOOR MOVIES. The licensor and owner of the pending trademark is Ultimate Outdoor Entertainment, LLC, a Texas Limited Liability Company, owned by Laura (U.S. Ser. No. 87/840,479). *See* Affidavit of Laura Landers at ¶ 4.

2.     Plaintiff, UOM was formed on June 8, 2010 and originally named FunFlicks

Outdoor Movies of Texas, Inc., for purposes of operating as a FunFlicks Licensee.  On October 12, 2016, UOM converted from a Texas Corporation to a Texas Limited Liability Company and became FunFlicks Outdoor Movies of Texas, LLC. On October 13, 2017, UOM changed its name from FunFlicks Outdoor Movies of Texas, LLC to Ultimate Outdoor Movies, LLC. Certified copies from the State of Texas reflecting the name change and conversion are attached hereto as Exhibit 1.

   3.  Defendant, FunFlicks Audiovisuals is California Corporation ("FF HUNTER/DIAS owned and operated by the Defendants, Mathew Dias and  Charles Hunter a/k/a Chad Hunter ("Mr.  Hunter"); both residents of the State of California. *See* Darrell Affidavit at ¶64. Defendant FunFlicks, LLC is a Maryland Limited Liability Company, with its principal place of business located in Maryland ("FF SEVERN") and is owned and operated by the Defendant Todd, Severn a Maryland resident ("Mr. Severn"). See Darrell Affidavit at ¶65. Defendant NATJAY, LLC is a Maryland Limited Liability Company with its principal place of business located in Maryland 21122 ("NATJAY") and is owned and operated by the Defendant, James Gaither, a Maryland Resident ("Mr. Gaither"). See Darrell Affidavit at ¶66.

### III.  FACTS RELEVANT TO UOM'S MOTION.

### A.  HISTORY OF THE FUNFLICKS BUSINESS, FF DARRELL AND UOM

   4.  The FunFlicks Movie Business[1] originated with Mr. Severn and FF SEVERN in the state of Maryland and later expanded to areas throughout the United States. FF Severn

---

[1] The term "Movie Business" means full service indoor and outdoor audio/visual presentations and events of all types  using inflatable screens of all sizes, projectors, sound systems, popcorn machines and other complimentary accessories at a site designated or directed by the consumer. Examples of such audio/visual events include but are not limited to movies, presentations, video gaming, live television, etc.

licensed the FunFlicks name and territories to independent business known as FunFlicks licensees, The licensees were independent contractors. The licensees were neither agents nor employees nor of the FunFlicks licensor.  See Darrell Affidavit at ¶4.

5.       Plaintiff, UOM was formed on June 8, 2010 and originally named FunFlicks Outdoor Movies of Texas, Inc., for purposes of operating as a FunFlicks Licensee.  On October 12, 2016, UOM converted from a Texas Corporation to a Texas Limited Liability Company and became FunFlicks Outdoor Movies of Texas, LLC. On October 13, 2017, UOM changed its name from FunFlicks Outdoor Movies of Texas, LLC to Ultimate Outdoor Movies, LLC. See Darrell Affidavit at ¶4.

6.       On about December 4, 2012, FunFlicks, Inc. was created as a Texas Corporation originating with the name, FunFlicks, Inc. On or about October 12, 2016 FunFlicks, Inc. converted to a Texas Limited Liability Company known as FunFlicks, LLC and on November 12, 2018, converted to LND, LLC (hereinafter referred to as "FF DARRELL"). *See* Darrell Affidavit at ¶5

7.       FF DARRELL was created for purposes of acquiring the assets of FF SEVERN for purposes of running the FunFlicks Licensor Movie Business. *See* Darrell Affidavit at ¶6. At the time FF DARRELL was formed, Laura was an investor holding shares in both FF DARRELL, and UOM. Darrell was also an investor holding shares in these two entities as well. As of October 2016, Darrell was the 100% owner of FF DARRELL and Laura was 100% owner of UOM. Darrell and Laura were married on July 1, 2017. *See* Darrell Affidavit at ¶7.

8.       In January 2013, FF DARRELL began running the national licensor, FunFlicks Movie Business after purchasing the FunFlicks business assets from FF SEVERN pursuant to an

Asset Purchase Agreement dated December 31, 2012[2] and signed in January 2013 (the "2013 APA"). As part of this purchase, FF DARRELL acquired FF SEVERN'S local operating territories which consisted of FunFlicks territories located in Maryland, Delaware, and the District of Columbia ("the UOM MDD Territory"). The information for this territory is identified in the 2013 APA purchase allocation schedule as the "Customer Base of MD[3] including client list, phone numbers, emails, past invoices and QuickBooks accounting records" (the UOM Pre-2013 MDD Client List"). (A true and correct copy of this purchase allocation schedule is attached hereto as Exhibit 2 and is hereinafter referred to as the "2013 APA Purchase Price Exhibit". *See* Darrell Affidavit at ¶ 8.

9.      As set forth in the 2013 APA Purchase Price Exhibit FF DARRELL paid $450,000.00 for the UOM Pre 2013 MDD Client List. The $450,000.00 paid included only the customer base information for the Pre UOM Pre-2013 MDD Client List which represented the UOM MDD Territory as of December 31, 2013 operated by Mr. Severn and FF Severn in a capacity similar to that of a FunFlicks Licensee. *See* Darrell Affidavit at ¶ 9. In early 2013, FF DARRELL transferred the Pre-2013 UOM MDD Client List to UOM which operated as a FunFlicks Licensee while FF DARRELL ran the FunFlicks operations as a licensor of the FunFlicks name and Movie Business. *See* Darrell Affidavit at ¶ 10.

10.      In connection with the 2013 APA, FF SEVERN took back a Promissory Note dated December 31, 2012 and executed in January 2013 (the 2013 NOTE") and a Security

---

[2] Referred to in the First Amended Complaint as Asset Purchase Agreement dated [sic] January 1, 2013.

[3] The pre-2013 Customer Base of Maryland included the pre-2013 customer base for Maryland, the District of Columbia and Delaware.

Agreement dated December 31, 2012, executed in January 2013 (2013 SECURITY AGREEMENT") from FF DARRELL in all of FF DARRELL's assets in existence as of December 31, 2012. A copy of the 2013 SECURITY AGREEMENT is attached hereto as Exhibit 3. *See* Darrell Affidavit at ¶11 The 2013 SECURITY AGREEMENT secured the FF DARRELL assets purchased from FF SEVERN but failed to contain an after acquired property clause.¶ 11.

11.     In 2017 and until late February 2018, UOM held FunFlicks' territories in Austin, Dallas, Fort Worth, Houston, San Antonio, Oklahoma City, Tulsa, Memphis, Nashville, Huntsville Alabama, Maryland, District of Columbia, Delaware, New Jersey, Philadelphia area, Denver, Northern Virginia and North Carolina and Little Rock. ("UOM Territories"). *See* Laura Affidavit at paragraph 5. As to all of UOM's FunFlicks Territories:   (1) UOM generated $1,446,233.00 in sales in 2017; (2) generated 5,719 in customers and leads in 2017; and (3) had 30,712 in total customers and leads between 2013 and 2017.

12.     In the state of Maryland alone, (1) UOM generated $199,210 in sales and $139,447.00 in 2017; (2) generated 829 customers and leads in 2017; and (3) had 3,063 customers and leads consisting of Maryland residents and businesses between 2013 and 2017. *See* Laura Affidavit at ¶6. From 2010 and until late February 2018, UOM held the most territories of any single FunFlicks licensee in the United States and was the highest sales generator of any FunFlicks licensee, accounting for more than twenty two percent of the FunFlicks total annual sales in 2017.  *See* Darrell Affidavit at ¶62. Beginning in 2008 and over the next several years until February 20, 2018, UOM used the following e-mail addresses for UOM's business.

5

Darrell@Funflicks.com          Events@funflicks.com          Chandra@funflicks.com
Laura@Funflicks.com            Kenneth@funflicks.com         MB@funflicks.com

13.     (hereinafter collectively referred to as the "UOM FunFlicks Emails"). *See* Darrell

Affidavit at ¶ 40. The above e-mail addresses are associated with UOM's business and UOM's

employees. *See* Darrell Affidavit at ¶ 40. The UOM FunFlicks email addresses were used by

UOM and it's employees, and not used by any other licensee. *See* Darrell Affidavit at ¶ 43. UOM

was not required by either FF SEVERN or FF DARRELL to obtain an e-mail address containing

the @funflicks.com domain; it was an option. *See* Darrell Affidavit at ¶ 44. At the time these e-

mails were issued, there was no notice, policy, or agreement governing the use of, or which

permitted the FunFlicks licensor to covertly intercept, or access the UOM FunFlicks E-mails or

any other emails belonging to users of the e-mail addresses containing the @funflicks.com

domain designation.  *See* Darrell Affidavit at ¶ 44.

14.     The UOM FunFlicks Emails were the primary source of communications with

UOM's customers up until February 20, 2018.  *See* Darrell Affidavit at ¶ 45. When a customer

contacts UOM, there are at least 10 automated e-mail messages that are sent throughout a

customer's lifecycle for a single event. These notices range from quote reminders, contract

reminders, payment reminders, friendly event reminders, weather policies, thank you messages,

automated next year quote e-mail messages and more.  *See* Darrell Affidavit at ¶ 46. In UOM's

experience many of UOM existing customers who want to re-book a subsequent event simply

find one of UOM's previous e-mail communications in their inbox and reply to it asking about

availability for their next event date. *See* Darrell Affidavit at ¶ 47.

15.     When FF DARRELL became the licensor for the FunFlicks name, FF DARRELL

became the electronic communications service provider for email addresses containing the URL www.FunFlicks.com and continued thereafter until on or about February 28, 2018. *See* Darrell Affidavit at ¶ 32.  During this time, FF DARRELL maintained the web/email data on a separate web/email server from the www.funflicks.com domain server. *See* Darrell Affidavit at ¶ 33. FF DARRELL's web/email servers holds the information regarding all of the user email accounts and the FunFlicks email/web server data generated to March 1, 2018.

16.     In January, 2013, the URL, www.FunFlicks.com, was set up on a separate and distinct DNS server which was controlled by FF SEVERN in escrow ("Escrow DNS Server"). *See* Darrell Affidavit at ¶ 30. The Escrow DNS Server pointed the www.FunFlicks.com URL to the FF DARRELL web/mail servers. An illustration of this configuration is attached hereto as Exhibit 4. However, the Escrow DNS Server did not contain any individual email address information. *See* Darrell Affidavit at ¶ 33. FF SEVERN could not access the FF DARRELL web/mail servers. *See* Darrell Affidavit at ¶ 41.

**B.     FF DARRELL ATTEMPTS TO RE-NEGOTIATE 2013 NOTE AND SECURITY AGREEMENT IN THE FALL OF 2017.**

17.     In late, October early November, 2017, Darrell reached out to Mr. Severn to renegotiate the 2013 APA, 2013 NOTE and 2013 SECURITYAGREEMENT. *See* Darrell Affidavit at ¶ 12.  On or about December 1, 2017, FF SEVERN advised FF DARRELL that they were in agreement as to amending the 2013 APA, the 2013 NOTE and the 2013 SECURITY AGREEMENT. FF SEVERN's attorneys advised FF DARRELL' attorneys that they would prepare the amended documents in January 2018. *See* Darrell Affidavit at ¶ 13.

18.     On or about December 21, 2017, unbeknownst to Darrell at the time, FF

7

SEVERN covertly signed an asset sale agreement with FF HUNTER/DIAS which attempted to sell all of FF DARRELL'S assets, including assets which were not covered by the 2013 SECURITY AGREEMENT, (the "2017 Asset Sale"). *See* Darrell Affidavit at paragraph 14.  The 2017 Asset Sale did not include the UOM FunFlicks License which represented more than 22% of all of the Sales under the FunFlicks name. *See* Darrell Affidavit at ¶ 63. DARRELL and FF DARRELL disputed FF SEVERN'S 2017 ASSET SALE for reasons including but not limited to FF SEVERN'S breach of good faith and fair dealing and for selling assets which were not included as collateral in the 2013 SECURITY AGREEMENT. See Darrell Affidavit at ¶16.  In an effort to resolve the dispute, FF DARRELL and FF SEVERN began a second round of settlement discussions in early January 2018. *See* Darrell Affidavit at paragraph 17.

## C.        NEGOTIATIONS BETWEEN UOM AND FF HUNTER/DIAS.

19.     Mr. Dias and Mr. Hunter as the directors and officers of FF HUNTER/DIAS reached out to Darrell and Laura in early January 2018 to discuss UOM's continuation of operating as a FunFlicks Licensee *See* Darrell Affidavit at ¶ 18.  As of February 1, 2018, UOM thought it reached an agreement to the major terms of a licensing agreement with FF HUNTER/DIAS which Mr. Hunter subsequently represented to UOM was turned over to their attorneys to prepare the final agreement. *See* Darrell Affidavit at ¶ 19. In reliance, of Mr. Hunter's assurances, UOM released the control of the Inflatable Office subscriptions in the Landers IO System to the individual FunFlicks licensees as a sign of "good faith." showing FF HUNTER/DIAS and the other FunFlicks Licensee that UOM genuinely wanted to continue as a FunFlicks Licensee. FF HUNTER/DIAS did not have any centralized control of, or access to, or in ownership in the FunFlicks Licensee's Client. *See* Darrell Affidavit at ¶ 21.

8

20.     For a period of more than two weeks, Mr. Hunter delayed the finalization of the UOM FunFlicks License. *See* Darrell Affidavit at ¶ 23. On or about February 20, 2018, UOM realized that FF HUNTER/DIAS had no intention of entering into a license agreement; and changed their name to Ultimate Outdoor Movies and began operating their business under a different name more closely related to their other business, Ultimate Outdoor Entertainment. *See* Darrell Affidavit at ¶24. On February 27, 2018, Mr. Gaither while under contract for UOM sent out the Defamatory Statement signed "the FunFlicks Team" after misappropriating the UOM Mid-Atlantic-Client List while under contract with UOM. *See* Laura Affidavit at ¶ 11.

**D.     FF DARRELL AND DARRELL ENTER INTO THE 2018 SETTLEMENT AGREEMENT WITH MR. SEVERN and FF SEVERN.**

   **FF DARRELL RETAINS THE EXISTING FUNFLICKS GOODWILL[4]**

21.     In March 2018 FF DARRELL and Darrell and FF SEVERN and Mr. Severn entered into a Settlement Agreement with an effective date of March 3, 2018 ("2018 SETTLEMENT AGREEMENT")   A true and correct copy the 2018 SETTLEMENT AGREEMENT is attached hereto as Exhibit 5. *See* Darrell Affidavit at ¶26. The 2018 SETTLEMENT AGREEMENT inured to the benefit of UOM allowing it to continue to capitalize off of the FunFlicks goodwill generated by the FunFlicks name up to March 3, 2018 and allowed UOM to continue after that date to capitalize off of, *inter alia*, the former FunFlicks trade dress, the FunFlicks confidential marketing and systems information, confidential information, and documents. UOM also maintained full use of the Landers' IO system.

---

[4] *See Basile Baumann Prost Cole & Assocs. v. BBP & Assocs. LLC*,  875 F. Supp. 2d 511, 525-27 and fns. 18, 19, 20 and 21.  (D. Md. 2012) for an understanding of goodwill.

22.     Under the 2018 SETTLEMENT AGREEMENT, FF HUNTER/DIAS did not obtain the FunFlicks current goodwill, particularly as it relates to the UOM Territories. FF HUNTER/DIAS obtained no brand goodwill which had accrued up to March 3, 2018. The brand goodwill was expressly excluded under paragraph (2)(a) of the 2018 SETTLEMENT AGREEMENT. The term Collateral is defined in the 2018 SETTLEMENT AGREEMENT. This term also defines what is expressly excluded from the 2018 SETTLEMENT AGREEMENT. The term Collateral is defined as follows:

> **2(a)** "Collateral" shall mean the following as each subsection is hereinafter defined and *as each existed under and at the time of' the execution of the* APA. The Security Agreement, and associated instruments: Trademarks. Copyrights. URLs. Associated Goodwill. Customers' Info, Google Analytics, and Contracts.
>
> *Expressly excluded* from the definition of "Collateral" are any:
>
> - (1) assets that were transferred as part of the APA and listed in Allocation of Purchase Price Exhibit[5] to the APA and the schedules *thereto that are not specifically identified in this paragraph as part of the Collateral*: and
>
>  (2) accessions. Alterations, additions or modifications to the Collateral *after the effective date of the APA*[as of December 31, 2012]; and
>
> (3) *assets* acquired by the Landers Entities [FF DARRELL and Darrell]  after the effective date of the APA, *including but not limited to goods*. machinery, equipment, property, accounts, chattel paper. proceeds of after-acquired assets, claims, deposit accounts. documents. contract rights, *general intangibles[6]*, instruments, investment property. letter-of-credit rights, letters of credit, cash. and/or rights to payment of money. [*emphasis added*].

---

[5] Footnote 1 of the 2018 SETTLEMENT AGREEMENT provides: This exhibit is listed in the List of Exhibits following the APA as Exhibit 2.2(k), but titled Exhibit 2.2(h).

[6] Md. Code Ann., Com. Law § 9-102  "General intangible" means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

23.     The 2013 Purchase Price Exhibit provides in part:

  Goodwill of Brand and continued Business  $1,521,248.00

24.     The 2018 SETTLEMENT AGREEMENT is devoid of the term "goodwill of brand" referred to in the 2013 Purchase Price Exhibit; the 2018 SETTLEMENT AGREEMENT is also devoid of the term goodwill of the "continued business." Consequently, pursuant to Paragraph 2(a) of the 2018 Settlement Agreement, these items were expressly excluded from the transfer to FF SEVERN[7] and subsequently, FF HUNTER/DIAS. FF DARRELL continued to retain the existing brand and business goodwill generated by FunFlicks through March 3, 3018 which inured to the benefit of UOM. Furthermore, FF SEVERN rejected more than twenty-two percent of the FunFlicks business as a result of FF SEVERN not taking an assignment of UOM's FunFlicks Licenses. Consequently, UOM retained the goodwill it generated as a FunFlicks Licensee.

25.     Furthermore, FF HUNTER/DIAS acquired no interest in the post-2013 FunFlicks website or its content pursuant to paragraph 2(f) because the site and information came into existence after 2013. See Darrell Affidavit at ¶32. Accordingly, the FunFlicks business lost its trade dress goodwill in the FunFlicks website.

26.     The 2018 SETTLEMENT AGREEMENT contains only one reference to goodwill and that is the defined term "Associated Goodwill." The defined term Associated Goodwill provides as follows:

---

[7] Other items **completely excluded** from the Settlement Agreement under Paragraph(2) which appear in the 2013 APA Purchase Price Exhibit, include, *inter alia*,   FF DARRELL's Equipment and trailers, Inventory, promissory note receivables. Another substantial asset excluded the 2018 Settlement Agreement was the UOM FunFlicks License Agreement accounting for over 22% of total FunFlicks sales in 2017.

"Associated Goodwill" shall mean.

- information and know how relating to the Collateral,

- information about vendors, suppliers, and business contacts and

- the right to sell products, licenses and franchises of FunFlicks

- as such existed under and at the time of the execution or the APA,  the Security Agreement, and associated instruments [emphasis added].

27.    These items are expressly defined in the 2013 Purchase Price Exhibit as follows:

| | |
|---|---|
| Information Base and know-how. | $10,000.00 |
| Supplier base including vendors, suppliers, and business contacts | $10,000.00 |
| Rights to sell products licenses, franchises of **FunFlicks to third parties.** | $108,000.00 |

28.    Although, Associated Goodwill is a defined term, the definition itself does not include any reference to brand goodwill or business goodwill which were specifically identified in the 2013 APA but excluded in the 2018 SETTLEMENT AGREEMENT. Notwithstanding, information defined as "Associated Goodwill" is limited to the execution date of the 2013 APA. Consequently, the 2018 SETTLEMENT AGREEMENT eliminated the goodwill barriers which permitted UOM to trade off its own business goodwill and the trade dress goodwill that was generated during its time as a FunFlicks Licensee, as well as any residual goodwill attached to UOM for the nine years it operated as a FunFlicks Licensee.

29.    Furthermore, FF SEVERN and FF HUNTER/DIAS forfeited any goodwill associated with any FunFlicks information, confidential, or otherwise, which was transferred to FunFlicks pursuant to paragraph 5 of the 2018 SETTLEMENT AGREEMENT which permitted FF DARRELL to "use in any manner" any of the goods, documents, information, materials, or other items transferred pursuant to paragraph 5 of the Settlement Agreement with the exception of the URL www.FunFlicks.com or www.shoscreen.com provided the use does not include the

image or name of "FunFlicks" or  "Todd Severn".

**E.      UOM owns its Global Client List.**

    30.     UOM owns exclusively, the UOM Global Client List[8] for the following reasons:

      a.   UOM contracts directly with its customers. *See* Laura Affidavit at ¶ 11.

      b.   Each booking of a UOM customer was done by and through UOM. *See* Laura Affidavit at ¶ 11.

      c.   UOM's Client Information[9] is also utilized by and through Laura's other business, Ultimate Outdoor Entertainment which consists of outdoor and indoor entertainment services other than the Movie Business. This same practice is also utilized by other FunFlicks entities such as Big Bounce Fun House Rentals, an Indiana company and a current FunFlicks licensee using bigbouncefunhouserentals.com. This company offers a variety of products in addition to FunFlicks outdoor movies as reflected on its web site-

      -(http://bigbouncefunhouserentals.com/category/fun_flicks/). *See* Laura Affidavit at ¶11.

      d.   Mr. Hunter admitted to Darrell that FF HUNTER/DIAS was fully aware that the FunFlicks Licensee Customer Information does not belong to the licensor, but to the individual licensees. Mr. Hunter wrote in an email dated January 19, 2018 to Darrell which states in part the following:

        . . . . a signed pledge that we are aware the data does not belong to us but to the individual licensees. Furthermore we would never use or exploit their customer data.

    *See* Darrell Affidavit at ¶21 and Exhibit A attached to the Darrell Affidavit.

---

[8] UOM's Global Client List means UOM's Client Information pertaining to the UOM Territories excluding the Pre-2013 MDD Client List.

[9] "Client Information" includes but is not limited to the information consisting of existing and prospective clients'--- a. names and contact information; b. purchase history; c. scheduling history; d. inquiry history; e. pricing information; and f. details regarding their experience with the provider of the Movie Business services.

e.  FF SEVERN, when it was a licensor, recognized that the "leads and Customer

Lists belonged to the Debtor exemplified in a Security Agreement between FF

SEVERN and a FunFlicks licensee. A true and correct copy of this security

agreement is attached hereto as Exhibit 6   which provides at section 2 the

following.

> **Section 2. The Security Interest**. Debtor hereby grants to the Secured
> Party a continuing security interest in all the assets in connection with Fun
> Flicks Outdoor Movie Projection business including projection, sound and
> popcorn equipment also including **customer leads and customer list** of
> **Debtor** (the "Collateral").  [emphasis added].

> *See* Darrell Affidavit at ¶ 61.

f.  The term "business contacts" as it appears in paragraph 2(e) of the Settlement

Agreement does not mean Customer Information. The term Customer Information

is a separately defined term in the 2018 SETTLEMENT AGREEMENT and is

noticeably absent from the term "Associated Goodwill." The Customer

Information is defined in the Settlement Agreement as:

> **2(f) "Customer Info"** shall mean information regarding the customers of **[FF
> DARRELL]** including client list, phone numbers, emails, past invoices and
> Quickbooks accounting records, including the customers in the ***MD, DE, DC***
> territories ***as such existed under and at the time*** of the execution or the [2013]
> APA, the [2013] Security Agreement, and associated instruments.

g.  FF DARRELL was formed on December 4, 2012; 27 days before the effective

date of the 2013 APA. The only FunFlicks licensee customer information

received at the time of the execution of the APA was FF SEVERN's local

customers that made up the Pre-2013 MDD Client List consisting of the items

identified in the 2013 APA Purchase Price Exhibit and came from FF SEVERN

14

which operated the Movie Business in the 2013 MDD Territory in a similar capacity as a FunFlicks licensee. The 2013 APA Sale did not include the sale of any other FunFlicks Licensee Customer Information. *See* Darrell Affidavit at ¶8.

h. The 2013 Purchase Price Exhibit referenced in (2)(a) of the defined term "Collateral" shows that no other FunFlicks licensee Customer Information was transferred to FF SEVERN other than the Pre-2013 MDD Client List, a list of territories operated by FF SEVERN. The Purchase Price Exhibit provides in part as follows:

> Customer Base of MD including client list,        $450,000.00
> phone numbers, emails, past invoices and
> QuickBooks accounting records.

i. FF HUNTER/DIAS did not obtain rights to the UOM's Global Client Information.  Paragraph 4(f) of the 2018 SETTLEMENT AGREEMENT gave permission only to the individual licensees to use the customer information and data in their possession. FF SEVERN and FF HUNTER/DIAS did not receive permission to use the FunFlicks licensee's customer information.  Paragraph 4(f) of the 2018 SETTLEMENT AGREEMENT provides in part:

> with respect to any customer information or data in the possession of the licensees under the Contracts the licensees (not including James Gaither. NatJay, LLC.[10] or any associated individual or entity) can use such data.[emphasis added].

---

[10] James Gaither and Natjay were licensed by FF HUNTER/DIAS and accordingly were not part of the assets transferred as part of the Settlement Agreement.  They are identified in the Settlement Agreement, to ensure that Mr. Gaither, Natjay, LLC and any associated with them could not use the Customer Information the Defendants stole from UOM or any other customer information.

j.   Because, FF DARRELL was retaining the then existing current goodwill of the FunFlicks business, FF DARRELL's permission ensured that there was no dispute that the current FunFlicks licensees owned their respective CLIENT INFORMATION generated by the FunFlicks Licensees through the FunFlicks name. Notably, FF DARRELL did not grant this permission to FF SEVERN or FF HUNTER/DIAS in the 2018 SETTLEMENT AGREEMENT.

k.   FF HUNTER/DIAS never acquired central control of the licensee's FunFlicks licensees Client Information to the LANDER'S IO Database system used by a majority of the FunFlicks Licensees or ownership to the FunFlicks Licensee Information. *See* Darrell Affidavit at ¶21.

l.   The HDAV defendants participated with FF SEVERN and had full knowledge of the 2018 Settlement Agreement. At the time it was executed, FF SEVERN were required to have FF HUNTER/DIAS conform their 2017 Asset Sale Agreement to the FF DARRELL'S limited assets assigned to FF SEVERN in the 2018 SETTLEMENT AGREEMENT and in connection therewith.

m.   FF HUNTER/DIAS did not object to the terms forth in terms of the 2018 SETTLEMENT AGREEMENT and See Darrell Affidavit at ¶26.

n.   The 2018 SETTLEMENT AGREEMENT did not permit FF SEVERN or FF HUNTER/DIAS access to any of FF DARRELL's web/email server data. *See* Darrell Affidavit at ¶26.

**F.      FF SEVERN REDIRECTS THE WWW.FUNFLICKS.COM URL TO FF HUNTER/DIAS WEB/EMAIL SERVERS.**

16

31.     FF SEVERN had the ability to redirect the www.funflicks.com URL to FF HUNTER/DIAS because FF SEVERN held this URL in escrow through a DNS server in FF SEVERN'S control. *See* Darrell Affidavit at ¶31.

32.     FF SEVERN did not have access, authority or the ability to redirect FF DARRELL's web/email server information which contained the website and e-mail data associated with the www.funflicks.com URL when used by FF DARRELL. This website and e-mail data was stored on a completely different web/server host. *See* Darrell Affidavit at ¶¶33, 50.

33.     On or about March 1, 2018, FF SEVERN disconnected the FunFlicks URL link to the FF LANDER's web/email servers by changing the DNS server setting on the Escrow DNS Server which prevented all users, including UOM, from sending and receiving emails whose emails contained the @FunFlicks.com domain. *See* Darrell Affidavit at para. 48.

34.     Mr. Severn then caused a new link to be created directing the www.FunFlicks.com domain to FF HUNTER/DIAS's newly created web/email servers. *See* Illustration at Exhibit 4. *See* Darrell Affidavit at ¶49.

35.     FF HUNTER/DIAS had to re-create the e-mail addresses for each existing FunFlicks Licensee because FF HUNTER/DIAS did not have access to FF DARRELL's web/email server. *See* Illustration attached hereto as Exhibit 4.

36.     UOM was not a user of FF HUNTER/DIAS' e-mail service. *See* Darrell Affidavit at ¶51. UOM was never able to send and receive the UOM FunFlicks e-mails from the FF HUNTER/DIAS mail/web servers. *See* Darrell Affidavit at ¶ 52.

17

G.      **DEFENDANTS USE COUNTERFEIT EMAILS TO INTERCEPT UOM CLIENT MESSAGES INTENDED FOR UOM.**

37.     In addition to creating the other users' @funflicks.com emails, FF HUNTER/DIAS covertly created counterfeit UOM FunFlicks Email addresses for purposes of intercepting UOM Customers emails intended for UOM.

38.     As the busy season for UOM approached in April and May 2018, Darrell and Laura became suspicious that UOM's e-mails were being intercepted because many of UOM's clients had not rebooked with UOM. Although UOM had sent out e-mail notices to all of their clients about the email change, more than usual had not re-booked their 2018 events.  At first Laura and Darrell sent out emails to their UOM FunFlicks e-mail addresses expecting to receive a rejection to the sent email address. However, UOM received no response at all. *See* Darrell Affidavit at ¶ 50.

39.     In June 2018, UOM lost a $15,000 per year account, Emmis Broadcasting, an Austin, Texas UOM client as a result of the FF HUNTER/DIAS intercepting Darrell's former UOM, e-mail. *See* Darrell Affidavit at ¶ 50, 53-56.

40.     To confirm UOM's suspicions, Darrell, posing as a fictitious client of UOM sent an e-mail to himself using his former FunFlicks e-mail address (Darrell@funflicks.com).

41.     Mr. Severn, through FF HUNTER/DIAS's web/email servers intercepted, disclosed and or used Darrell's intercepted email to solicit what Mr. Severn believed to be a UOM Customer.  A true and correct copy of this email string is attached hereto as Exhibit 7. *See* Darrell Affidavit at ¶ 58.

42.     The email communication between Mr. Severn and Darrell a/k/a Richard

18

Hornacek reads in part as follows:

Subject: Mall Movie Nights
Date: Thu, 14 Jun 2018 02:41:43 +0000

From: Richard Hornacek richard_hornacek@federatedmarketingllc.com

To: Darrell Landers <darrell@funflicks.com>

Darrell,

My apologies for taking so long to get back to you, I finally got concept approval from all of the local mall marketing directors to move forward with the movie nights that we discussed in Jan and I have a finalized list of locations for you below. I thought we were going to have 6-8 that were interested but ended up with 14 that loved the idea and another 2-3 that are still considering. We need updated pricing for this list since we've had so many changes since we started. We appreciate the 10% discount you provided when we discussed doing 6-8 events but wanted to know if you can do any better with the price now that we have 14 on board? Each mall director is working on their movie title and we would like for you to take care of licensing for us. I set a deadline of July 1 for each mall director to get me their movie name.

You mentioned that we could do this with one contract. Our national marketing team is paying for the events even though each mall is funding from their local budgets. When can you let me know about availability and pricing for each of these? My objective is to get the pricing approved and then hold a planning call in July to coordinate details.
August 4th – 45' Epic Screen Drive-In
Biltmore Fashion Mall – Phoenix, AZ ….
. . .Northlake Mall – Charlotte, NC

August 18th – 45' Epic Screen Drive-In (need generator service at The Summit)

Fashion Show Mall – Newport Beach, CA . . .

. . .The Galleria – Houston, TX

I'm traveling to Boston the rest of this week and would like to present pricing to my team when I

get back  to Cincinnati on Monday.

Thank you,

Richard Hornacek

Sent from my iPhone

43.     Mr. Severn responded to this email as follows:

**From:** FunFlicks <all@funflicks.com>

**Date:** June 14, 2018 at 5:11:50 PM CDT

**To:** <richard_hornacek@federatedmarketingllc.com>, "todd@funflicks.com"

<todd@funflicks.com>

19

**Subject: Fwd: Fwd: Mall Movie Nights**

Hi Richard,
Great to hear from you. Your events were mentioned in the office months ago and was wondering if this might be a reality. Glad this has been such a success on your end!!

We are currently working on a package quote for all of your locations listed.
(FYI, Darrell is no longer here at FunFlicks® - will explain when we talk)

Please reach out to me directly - if you have easy access to zip codes for each location, that would help me tighten up the prices.

My goal is to have a package to you by end of day tomorrow.
Thanks!
Talk soon,
Todd
(818) 732-6872
www.funflicks.com
todd@funflicks.com

44.     On or about April 27, 2018, Mr. Gaither, NATJAY, and the HDAV Defendants intercepted, disclosed and/or used an intercepted UOM FunFlicks E-mail events@FunFlicks.com intended for Kenneth Schwausch an existing employee with UOM. A copy of the email discussion between Mr. Gaither and Megan is attached to the Memorandum of Law as Exhibit 8 See Laura Affidavit at ¶12.  This e-mail was sent from Megan in the state of Maryland which provides as follows:

**Subject:**Re: Rental Agreement for Your 9/29/2017 FunFlicks Screen Rental

**Date:**Fri, 27 Apr 2018 07:47:13 -0400

**From:**Megan Watson president@ces-pta.com

**To:**FunFlicks Outdoor Movies <events@funflicks.com>

Hi Kenneth!

Wanted to see if the same movie package would be available on May 18,

Thank you

Megan

From: james@funflicks.com

Date: Fri, Apr 27, 2018 at 12:01 PM

Subject: RE:Rental Agreement for Your 9/29/2017 FunFlicks Screen Rental

To: president@ces-pta.com

Hey Megan,

You are in luck! We have one spot open for that date. I will prepare the quote for you shortly and send it over.

Thanks!

James

45.     By the Defendants intercepting, the UOM FunFlicks E-mail, Mr. Gaither was able to book an event with Megan when she was trying to book an event with Kenneth at UOM.

46.     Megan had a negative experience with James Gaither's Natjay and later discovered that she was not dealing with the same entity she had dealt with in 2017. A copy of Megan's email to Laura is attached hereto as Exhibit 9. *See* Laura Affidavit at ¶12.

47.     In Maryland alone, the Defendants, through their counterfeit UOM FunFlicks emails had the ability to intercept 851 or more Maryland customers or leads who clicked reply to one of the UOM FunFlicks Emails sent out in 2017 and in early January and February 2018.

48.     Overall, the Defendants' creation and use of the counterfeit e-mails gave the Defendants the ability to intercept responsive e-mails from more than 5,719 UOM customers who had received UOM emails in in 2017 and in early January and February 2018. See Laura Affidavit at ¶8. Going back several years of sent UOM emails the number of potential e-mails subject to interception by the Defendants is close to a million.

49.     Rather than cease using the counterfeit email addresses, FF HUNTER/DIAS as of October 16, 2018 FF HUNTER/DIAS recently started applying the events@funflicks.com e-mail marketing its own licensee events. Based on information and belief, FF HUNTER/DIAS is engaging in further acts to confuse the consumer and this Court regarding FF HUNTER/DIAS's

intentions. A true and correct copy of this Email is attached hereto as Exhibit 10. *See* Darrell Affidavit at Paragraph ¶60.

50.     Prior to March 1, 2018, FF Darrell had not issued a Twilight Productions@FunFlicks.com e-mail address. *See* Darrell Affidavit at ¶61 Consequently, FF HUNTER/DIAS created the TwilightProductions@FunFlicks.com email address after March 1, 2018 for use in mailers and invoicing in the territories where it operates in the capacity of a FunFlicks Licensee. There was no need to use events@funflicks.com except to give the false appearance that it was using the events@funflicks.com as an e-mail address for purposes other than intercepting UOM's clients.

51.     As of October 2018, the UOM lost $501,233.00 in sales, and $350,863.10 in lost profits from last year, a 35% decline from 2017.  See Laura Affidavit at ¶11. As of November 28, 2018, UOM's lost profits have increased to 37.6% for all of UOM's territories; As to Maryland, UOM lost profits have increased to 56.3%. *See* Laura Affidavit at ¶11. Monetary damages are inadequate to compensate UOM for the Defendants' acts described herein. The Defendants are continuing to intercept emails intended for UOM in violation of Federal Law. The Defendants are continuing to profit off of the ill gotten gains obtained by the Defendants. The lingering negative shadow cast on UOM by the Defendant's deceptive conduct makes it difficult to sufficiently calculate and to fully compensate UOM for its injuries. Furthermore, the public is harmed by the Defendants' misleading of UOM's customers resulting in a negative and deceptive experience for the UOM customer and casting a negative shadow on UOM's goodwill.

## IV.     ARGUMENT

FF HUNTER/DIAS created counterfeit e-mails formerly used by UOM and engaged in a nefarious scheme with Mr. Severn, and Mr. Gaither, and others to steal UOM's clients and goodwill.  FF HUNTER/DIAS' ultimate purchase of FunFlicks assets form FF SEVERN was not a successor-in-interest type of purchase; it was a fractured purchase blown apart by a faulty Security Agreement and a subsequent Settlement Agreement resulting in FF HUNTER/DIAS purchasing only a part of the FunFlicks Assets.  UOM owned the UOM Global Client List and the UOM Movie Business goodwill it had generated over the last ten years. Pursuant to the terms of the 2018 SETTLEMENT AGREEMENT, FF DARRELL retained the ownership of the current FunFlicks goodwill as of March 3, 2018; this ownership inured to the benefit of UOM in its territories.  FF DARRELL also retained ownership of the FunFlicks web/and email server data information up to March 3, 2018 which neither FF HUNTER/DIAS nor FF SEVERN had access to. When FF HUNTER/DIAS obtained the www.FunFlicks URL, they had to start from scratch with a completely separate web/server facility and operate a completely separate electronic communications service for their newly acquired business as a FunFlicks licensor. UOM never subscribed or used FF HUNTER/DIAS's web/server facility or communications facility.

It is important to note that the Settlement Agreement was not a sale of the FF DARRELL'S entire business and no goodwill transferred at the time of the 2018 SETTLEMENT AGREEMENT. *See Basile Baumann Prost Cole & Assocs. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 526 (D. Md. 2012) (the court held that the contract did not involve the sale of the Corporations entire business and goodwill where the corporation retained assets including, *inter alia*, 70 percent of the contracts and clients). In the case at bar, FF DARRELL retained the UOM

23

contract which represented more that 22% of the total sales for FunFlicks; FF DARRELL retained the brand and business goodwill and the trade dress goodwill for the FunFlicks website. FF DARRELL retained the right to use the confidential information and training materials. FF DARRELL's retention of this goodwill inured to the benefit of UOM. Furthermore, FF HUNTER/DIAS did not acquire UOM's Global Client Information; nor was it entitled to it.

Without notice to UOM, when a UOM customer inquired or requested services using a former UOM FunFlicks email address, the Defendants intercepted, disclosed and/or used these e-mails giving the false impression to the UOM customer that it was dealing with the same entity that had sent the original UOM email. The Defendants' interception of these emails could exceed Five thousand returned e-mails. When FF HUNTER/DIAS Purchased a portion of the FunFlicks assets from FF SEVERN, FF HUNTER/DIAS had no clients or current client related goodwill to protect in the UOM territories because FF HUNTER/DIAS never acquired and is not entitled to the UOM Global Client list or the current client goodwill associated with the UOM Territories. Furthermore, FF HUNTER/DIAS elected not to take UOM as a FunFlicks Licensee thereby abandoning UOM's business goodwill obtained over the last ten years.

Because the Defendants could not acquire UOM's goodwill through legitimate means the Defendants counterfeited the former UOM FunFlicks emails without UOM's knowledge or consent; nor was there any written policy in place giving a third party the right to covertly intercept these e-mails. As set forth above, the Defendants had no access to FF DARREL's FunFlicks e-mail servers. FF HUNTER/DIAS had to manually recreate, these email addresses. The counterfeit e-mails served no other purpose than to intercept and covertly steal UOM customers and clients from UOM.  The legal principles set forth below are controlling and

exemplify the principles of old-fashioned honesty emphasizing "***One may not reap where another has sown, nor gather where another has strewn***."

In granting a temporary restraining order or a preliminary injunction, the moving party must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest. Fed. R. Civ. P. 65, "*Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008). UOM satisfies all four prongs for a temporary restraining order and for preliminary injunctive relief.

### A.    THE DEFENDANTS VIOLATED THE FEDERAL WIRETAP ACT
####      COUNT  VIII (VIOLATION OF 18 U.S.C. SECTION 2511)

The Defendants violated the Federal Wiretap Act a/k/a the Electronic Communications Protection Act ("ECPA") under 18 U.S.C. § 2511(1). A person violates the ECPA when the person:

(**a**) intentionally intercepts[11], endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . .electronic communication[12][which affects

---

[11] 18 U.S.C.S. § 2510(12) provides: "intercept" means the aural or other acquisition of the contents of ***any*** . . . electronic . . communication through the use of **any electronic, mechanical, or other device**.[emphasis added].

18 U.S.C.S. § 2510(5) provides in part:  "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than--

(a)  any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or **electronic communication service** in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by **such subscriber or user for connection to the facilities** of such **service** and used in the ordinary course of its business; or (ii) being used by a provider of wire or **electronic communication service** in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties. [*emphasis added*].

[12] 18 U.S.C.S. § 2510(12) provides in part:  "electronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a

interstate commerce].

(c)  intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

(d)  intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

18 U.S.C. § 2511(1).

An e-mail constitutes an "electronic communication" under 18 U.S.C.S. § 2510(12) (*In re United States*, 416 F. Supp. 2d 13, 16 (D.D.C. 2006) (" . . there can be no doubt [the Federal Wiretap Act] is broad enough to encompass e-mail communications and other similar signals transmitted over the Internet). 18 U.S.C. Section 2520(a) provides:

 Except as provided in section 2511(2)(a)(ii), any person[13] whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

18 U.S.C. Section 2520(b) provides in part: (b) Relief:  "In an action under this section, appropriate relief includes-- (1) such preliminary and other equitable or declaratory relief as  may be appropriate".*[emphasis added]*.

For purposes of this TRO, and preliminary injunction the relief requested under 18

---

wire, radio, electromagnetic, photo-electronic or photo-optical system **that affects interstate or foreign commerce**[emphasis added].

[13] 18 U.S.C. §2510 (6) provides: "person" means . . .any  individual, partnership, association, joint stock company, trust, or corporation; Accordingly UOM qualifies as a person. *Directv, Inc. v. Powell*, 2006 U.S. Dist. LEXIS 21217, *7 (Person' has been defined as including corporations under 18 U.S.C. §2510 (6); therefore, plaintiff, corporation has standing to bring an action against the defendant for violating § 2511.

U.S.C. §2520, the plaintiff must show, *inter alia*,  a substantial likelihood of success on the merits that 18 U.S.C. §2511(1) (a), (c) or (d) and 18 U.S.C §2520(a) is applicable.   The Defendants interception of emails involved electronic communications affecting interstate commerce[14]. The interception of the emails involved, a Texas based business and their customers based in Maryland and Texas. Based upon information and belief the Defendants interception of e-mails directed to UOM is also going on in the other states where UOM' operates Furthermore, the Defendants located in Maryland and California caused the interception, use or disclosure to occur affecting UOM, a Texas based business. Accordingly, the intercepted e-mails "affects interstate commerce element" is satisfied.

The intent factor is satisfied evidenced by Mr. Severn's and Mr. Gaither's response, to the *Hornecek* and Megan emails, the Defendants' intent to intercept was not an accident. Mr. Gaither had full knowledge of Kenneth Schwausch evidenced by identifying Kenneth in his Defamatory Statement. *See Exhibit A* attached to the Laura Affidavit. FF HUNTER/DIAS recreated the UOM emails. Mr. Severn knew that he was intercepting Darrell's e-mail.

The interception factor is also satisfied. As set forth above, the Defendants, intercepted the FF HUNTER/DIAS web/email servers intercepted [contemporaneously with the transmission][15] Had the Defendants not created the counterfeit e-mail address, the FF

---

[14] 18 U.S.C. §2510(12).

[15] See e.g. *Hall v. EarthLink Network, Inc*., 396 F.3d 500, 505 (2d Cir. 2005)(Earthlink's email web/server receiving former user's Earthlink messages required a rebuttal of the "ordinary course exception" qualify as an electronic device). *See In re Google Inc. Gmail Litig., No. 13-MD-02430-LHK*, 2013 U.S. Dist. LEXIS 172784, at *30 (N.D. Cal. Sep. 26, 2013)(applying  "ordinary course exception analysis to Google's email servers intercepting messages intended for existing gmail users)(The District court rejected Google's argument that the

HUNTER/DIAS web/email server would not have received the message.

The Defendants used an electronic communications device, the FF HUNTER/DIAS web/servers and related electronic devices (the counterfeit UOM FunFlicks Emails) to intercept UOM's customer e-mails intended for UOM. These devices are not excepted devices under 18 U.S.C. § 2510(5); nor does an exception apply under 18 U.S.C. §2511(2)(a)(i).

The Defendants are not subject to the exceptions contained in 18 U.S.C.§ 2510(5)(excepted electronic devices) or 18 U.S.C. §2511(2)(a)(i) (exception for non public electronic communication service providers) because (1) the Defendants do not qualify as a provider of an electronic communication service; and (2) the Defendants fail the "valid business purpose test" originating in *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 741 (4th Cir. 1994). For either the statutory exceptions in 18 U.S.C.§ 2510(5) or 18 U.S.C. §2511(2)(a)(i)  to apply the following criteria are applicable:

(1) the defendant must be a provider of an electronic communications service of that particular, existing and authorized user; 18 U.S.C. § 2510(5), (13), (15)   18 U.S.C. §2511(2)(a)(i). *Shefts v. Petrakis*, No. 10-cv-1104, 2012 U.S. Dist. LEXIS 130542, at *25 (C.D. Ill. Sep. 12, 2012); and --

(2) the provider of an electronic communication must give prior sufficient notice of the interception or have a justified valid business purpose for the covert interception of a

---

ordinary course exception was not applicable because it was using its own devices to receive emails intended for gmail users.) *Gmail Litigation* at p. 34 n. 3.

person's electronic communication[16]. *See e.g. Sanders* at p. 741 (applied to ordinary course of business standard under 18 U.S.C. § 2510(5); This rational was applied to "electronic communications in In *re Google Inc. Gmail Litig., No. 13-MD-02430-LHK*, 2013 U.S. Dist. LEXIS 172784, at *30 (N.D. Cal. Sep. 26, 2013) (ordinary course of business /valid business purpose  cannot be expanded to mean anything that interests a company.") *citing  Berry v. Funk*, 146 F.3d 1003, 1009 (D.C. Cir. 1998 which adopted the 4th Circuit in Sanders valid business justification test).

Or – (3) consent of one of the parties to the communication pursuant to 18 U.S.C. §2511(2)(d).

As to factor 1, for the device to be excepted under 18 U.S.C.S. § 2510(5), the defendant must be a provider of an electronic communications service to the existing and authorized user of that particular provider. 18 U.S.C. §2510(5) applies only to the provider of the electronic communications service[17]. *Shefts v. Petrakis*, No. 10-cv-1104, 2012 U.S. Dist. LEXIS 130542, at *25 (C.D. Ill. Sep. 12, 2012). 18 U.S.C. § 2510(5) provides in part:

   "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than--

---

[16] See e.g. Sanders at p. 741( necessary to satisfy ordinary course of business standard under 18 U.S.C. § 2510(5) applied to "electronic communications in *In re Google Inc. Gmail Litig., No. 13-MD-02430-LHK*, 2013 U.S. Dist. LEXIS 172784, at *30 (N.D. Cal. Sep. 26, 2013) (ordinary course of business' cannot be expanded to mean anything that interests a company.") *citing  Berry v. Funk*, 146 F.3d 1003, 1009, (D.C. Cir. 1998)(requiring covert monitoring to be justified by a valid business purposes adopting the 4th Circuit's holding in *Sanders*).

[17] FF HUNTER/DIAS was not a successor in interest to FF DARRELL because the 2018 Settlement Agreement did not transfer all of FF DARRELL's assets.  The 2018 Settlement Agreement did not transfer, *inter alia*, the FF DARRELL web/server, or the FunFlicks goodwill as explained in this memorandum.  The only relevant items transferred to FF SEVERN and FF HUNTER/DIAS pertaining to @funflicks.com emails under the 2018 SETTLEMENT AGREEMENT is the designated URL www.FunFlicks.com, nothing more.

(a)  any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a ***provider of wire or electronic communication service*** in the ordinary course of its business and being used by the subscriber or user in ***the ordinary course of its business*** or furnished by such subscriber or user for connection to the facilities of ***such service*** and used in the ordinary course of its business; or (ii) ***being used by a provider of wire or electronic communication service in the ordinary course of its business,*** or by an investigative or law enforcement officer in the ordinary course of his duties. [emphasis added].

Likewise under 18 U.S.C. §2511(2)(a)(i) the exception is limited to the provider of an electronic communication service and reads as follows:

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of ***a provider of wire or electronic communication service***, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which ***is a necessary incident*** to the rendition of his service or ***to the protection of the rights or property of the provider of that service***, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks. [emphasis added]. 18 U.S.C. §2511(2)(a)(i).

The defendant must be a provider of an electronic communications service ("Provider") to the existing and authorized user of that particular user, *i.e.* the plaintiff. 18 U.S.C §2510 (15) provides the definition of "electronic communication service" which means "***any service*** which provides to users ***<u>thereof</u>*** the ***ability to send or receive wire or electronic communications***." 18 U.S.C §2510 (15) [emphasis added]. The meaning of the phrase "users thereof" as that term is used in the definition of electronic communication service under 18 U.S.C. §2510(15) means "users of that particular electronic communications service." The plain meaning of the term "thereof" means "of that or that particular." *See Merriam Webster's Dictionary* online https://www.merriam-webster.com/dictionary/thereof. 18 U.S.C. § 2510(13) provides the definition of user" which means any person or entity who-- (A)  ***uses an electronic***

30

*communication service*; and (B)  is duly ***authorized by the provider*** of such service to engage in such use.

Consequently, for the 18 U.S.C. § 2510(5) or §2511(2)(a)(i) exception to apply, the party complaining of the interception must be an authorized user of that particular electronic communications service. The term "electronic communications service" also does not apply to former users of an electronic communication service provider. Congress's present tense use of the term "provides" in 18 U.S.C. §2510(15) (which provides to users thereof") requires that the user of an electronic communications service be ***an existing user*** of the provider at the time the e-mail is intercepted, not a former user.  Likewise, 18 U.S.C. § 2510(13) uses the present tense "is duly authorized by the provider. . ."   This interpretation supports the privacy policy enunciated in *Warshak v. United States*, 490 F.3d 455, 478 (6th Cir. 2007) *vacated on other grounds United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)( recognizing a privacy right as to a user's former e-mail address. "[W]hen an e-mail user stops using an e-mail address that is tied to his personal identity, he would certainly not expect that somebody else could come along, sign up for the same account, and not only send e-mails in his name, but read every past e-mail that he had failed to delete from the account or sent to someone else.").

FF HUNTER/DIAS did not provide UOM with the ability to send or receive e-mails. UOM was never an authorized user of FF HUNTER/DIAS's web/email services. FF HUNTER/DIAS did not acquire FF DARRELL web/email servers. Because UOM "is not" and/or "was not" a user of the FF HUNTER/DIAS web/email service, FF HUNTER/DIAS is not a provider of an electronic communications service under the ECPA. Consequently, FF HUNTER/DIAS web/servers and counterfeit email addresses are electronic devices which are

31

not subject to the exception under 18 U.S.C. § 2510(5). For the same reasons, FF HUNTER/DIAS does not qualify as a provider of an electronic communication under §2511(2)(a)(i).

The Defendants also fail the second prong of the test. The Fourth Circuit in *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 741 (4th Cir. 1994) applies the following relevant test to 18 U.S.C. §2510(5):

> Is defendant's use of the device conducted in the ordinary course of its business? (Where covert interception occurs, the Fourth Circuit requires a valid justified business purpose. *Sanders,* 38 F.3d at 741.)

Although, the facts in *Sanders* applied to the interception of telephone conversations, the principles are equally applicable to the interception of e-mails, particularly as to the second factor. In *Sanders,* the court refused to allow the defendant to use the "ordinary course of business exception" to covertly intercept telephone conversations without prior notice or consent unless the covert use of a surveillance device was justified by a valid business purpose. *Id.* In *Sanders,* the defendant claimed it had covertly intercepted employee phone calls because it feared bomb threats. The Fourth Circuit held that this reason did not constitute a justified business purpose to conceal the wiretapping of defendant's employee telephone communications "in light of the Act's clear purpose of protecting individuals' privacy interests" *Id.* at 741. The valid business purpose reasoning applied by the Fourth Circuit in *Sanders* is equally applicable to the "necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service" exception set forth in 18 U.S.C. §2511(2)(a)(i).

Notwithstanding, the Defendants failure to qualify as a provider of an electronic communications service, the Defendants have no valid business purpose to conceal the

32

Defendants' interception of the electronic communications without first giving clear prior notice or obtaining prior consent pursuant to 18 U.S.C. §2511(2)(d). *See Warshak*, 631 F. 3d. at 286-87("it must be observed that the mere ability of a third-party intermediary to access the contents of [an electronic] communication cannot be sufficient to extinguish a reasonable expectation of privacy.  Similarly, . . .the ability of a rogue mail handler to rip open a letter does not make it unreasonable to assume that sealed mail will remain private on its journey across the country) *See also United States v. Bode*, No. ELH-12-158, 2013 U.S. Dist. LEXIS 118627, at *52 (D. Md. Aug. 21, 2013)( "noting that email 'pose[s] no greater risk of interception or disclosure than other modes of communication commonly relied upon as having a reasonable expectation of privacy' and so there is generally 'a reasonable expectation of privacy in its use") *citing United States v. Hamilton*, 701 F.3d 404, 408 (4th Cir. 2012).

     The Defendants do not have a valid business purpose for intercepting UOM's customer e-mails intended for UOM. They did not obtain any of FunFlicks goodwill which existed as of the March 3, 2018 SETTLEMENT AGREEMENT; UOM's goodwill stayed with UOM. UOM contracted with its own clients and owned its own Client Information. Furthermore, the Defendants had no legal interest in UOM's business. Consequently, there is no valid business purpose for re-creating the UOM FunFlicks e-mails.  Furthermore, the Defendants have no property interest to protect, particularly as to the UOM Territories because FF HUNTER/DIAS abandoned UOM's license and the goodwill associated with UOM's business. Notwithstanding, there is no valid business justification for conducting these acts covertly.  Even assuming consent by one party was given, the consent exception does not apply where the defendant commits a

tortious act. 18 U.S.C. §2511(2)(d). As set forth below, the Defendants have committed a tortious act by violating the Lanham Act.

**B.      THE DEFENDANTS VIOLATED THE FEDERAL LANHAM ACT. COUNT X, (15 U.S.C. §1125(1)(A), THE FEDERAL LANHAM ACT)**

15U.S.C. §1125(a) (1) provides:

(1)   Any person who, on or in connection with any goods or services, . . . uses in commerce any . . .**device,** or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which.

(A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The term device as used in this section is not restrictive and consists of almost anything carrying this meaning. *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 209-10 (2000) *citing Qualitex Co.* v. *Jacobson Products* 514 U.S. 159, 162 (1995)("Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive.").

A plaintiff's success under § 1125(a)(1)(A) requires the defendant's "use in commerce" of "any word, term, name, symbol, or device" or "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact[.] In order to pursue a claim under § 1125(a), a plaintiff who has proven a defendant's "use in commerce" of a false association must also satisfy Lexmark's two-part inquiry: (1) whether plaintiff's allegations fall within § 1125(a)(1)(A)'s zone of interests; and (2) whether plaintiff has alleged "proximate causation of a cognizable injury." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

34

U.S. 118,129-132 (2014). *Belmora, LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2013) citing *Lexmark,* 572 U.S. at 129-132 ("The zone-of-interests test is therefore an appropriate tool for determining who may invoke the cause of action in § 1125(a)" and "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant[.]"); *See also Farm Fresh Direct By a Cut Above, LLC v. Downey*, 2017 U.S. Dist. LEXIS 178190, *17, 2017 WL 4865481 (D. Md. 2017).

To meet the zone of interests test, a plaintiff must show facts showing its claim furthers an enumerated purpose of § 1125(a)(1)(A). *Lexmark,* 572 U.S. at 129-132; *Belmora*, 819 F.3d at 711. But, the "breadth of the zone of interests varies according to the provisions of law at issue." *Lexmark,* 572 U.S. at130. In other words, although the zone of interests test "is not 'especially demanding'" in the context of the Administrative Procedure Act's "'generous review provisions'", it may require more of a plaintiff bringing suit under another statute. *Id*. However, "[i]dentifying the interests protected by the Lanham Act . . . requires no guesswork, since the Act includes an 'unusual, and extraordinarily helpful,' detailed statement of the statute's purposes." 572 U.S. at 129-132 (*quoting* H.B. *Halicki Productions v. United Artists Communications, Inc.*, 812 F.2d 1213, 1214 (9th Cir. 1987))Those purposes are outlined in 15 U.S.C. § 1127, which state in part: "he intent of this chapter is to protect . .  **persons engaged in such commerce against unfair competition**; . ." [*emphasis added*].

Plaintiff has shown that its "injuries are proximately caused by violations of [§ 1125(a)(1)(A)]". To show proximate cause in a § 1125(a)(1)(A) claim, the plaintiff must show "'economic or reputational injury" flowing directly from the deception wrought by the defendant's'" false association. *Belmora*, 819 F.3d at 711-12, *quoting* Lexmark, 572 U.S. at 129-

132). As set forth above, UOM has proven that it lost a sale from Megan when she was duped by the intercepted e-mail into dealing with NATJAY and Mr. Gaither. Likewise, UOM lost a $15,000.00 client as result of another intercepted email in Texas. Given the current losses incurred by UOM, the number of e-mails intercepted by the Defendants is likely to run into hundreds, if not thousands of e-mails. The Defendants, through FF HUNTER/DIAS, re-created and rigged the UOM FunFlicks emails using a device to falsify the origin of the services being rendered. Although UOM had sent out prior emails advising its customers of its new e-mail address, when a UOM customer inadvertently replied to or used an old UOM FunFlicks email to contact UOM, their email was intercepted by FF HUNTER/DIAS using a device which gave UOM customers, a false designation of origin, or impression, that the UOM customers were dealing with the same UOM entity.

### C.      THE DEFENDANTS VIOLATED THE COMMON LAW TORT OF UNFAIR COMPETITION.  COUNT XIII

Maryland's common law tort of unfair competition can extend to "'all cases . . . in the field of business.'" *Electronics Store, Inc. v. Cellco Partnership*, 127 Md. App. 385, 407, (1999) (*quoting Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 236, (1943)). Generally, "Unfair competition is 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.'" *Thompson v. UBS Financial Services, Inc*., 443 Md. 47, 60, 115 A.3d 125, 133 (2015) (*quoting Balt. Bedding Corp*, 182 Md. at 237,) (internal quotation marks omitted. The rules of unfair competition preclude "trading by one dealer upon the good name and reputation built up by another." *Balt. Bedding*, 182 Md. at 237.

For the same reasons set forth above, the Defendants are attempting to pass themselves off as Laura's business, UOM, when it was a FunFlicks licensee. However, FF HUNTER/DIAS

36

abandoned UOM's goodwill when it elected not to acquire UOM's FunFlicks license in the 2017

Asset Sale. Furthermore, FF HUNTER/DIAS did not obtain the current FunFlicks goodwill as of

March 3, 2018 which inured to the benefit of UOM allowing UOM to operate as a going concern

without the name FunFlicks.

### D.   PLAINTIFF HAS SATISFIED THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

Plaintiff has satisfied the requirements for a temporary restraining order and preliminary

injunction. As set forth above, [1] UOM is likely to succeed on the merits [2] UOM is suffering

and continuing to suffer immediate irreparable injury as the Defendants continue to exploit the

UOM's goodwill from the illegal interception of UOM's communications and continues to

engage in illegal acts of intercepting the e-mails. [3] the balance of equities tips in UOM's favor

given the gravity of the harm; and [4] the injunction is in the public interest to prevent the

Defendants from exploiting the public through the illegal interception of UOM's customer's

emails. Monetary damages are inadequate to compensate UOM for the Defendants' acts

described in herein. The Defendants are continuing to intercept the emails in violation of Federal

and State Law; the Defendants are continuing to profit off of the ill gotten gains obtained by

these illegal acts. Furthermore the public is harmed by the Defendants' acts of deception

described above. Plaintiff has also demonstrated a likelihood of irreparable harm. Plaintiff has

presented evidence that it has lost clients as a result of Defendants' interception and solicitations.

and alleges its business continues to be threatened by Defendants' conduct. Evidence of

threatened loss of prospective customers or goodwill certainly supports a finding of the

possibility of irreparable harm." *Livewirecyber, Inc. v. Lee,* No. CV 17-00645-AB (ASx), 2017

U.S. Dist. LEXIS 220462, at *6-7 (C.D. Cal. Feb. 10, 2017) citing *Henry Schein, Inc. v. Cook,*

37

191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (*citing Stuhlbarg Int'l Sales Co. v. John D. Brush Co.*, 240 F.3d 832, 841 (9th Cir. 2001). The public interest is served, and the balance of hardships tips sharply in a plaintiff's favor when a defendant is required to do no more than comply with the law. *Livewirecyber, Inc.* at \*7 *citing Henry Schein, Inc.*, 191 F. Supp. 3d at 1077-78; *Dish Network L.L.C. v. Ramirez*, No. 15-CV-04712-BLF, 2016 U.S. Dist. LEXIS 72317, 2016 WL 3092184, at \*7 (N.D. Cal. June 2, 2016). Such is the case here. The relief UOM seeks will restrain Defendants from engaging in unlawful conduct, the hardship Plaintiff will suffer from far outweighs potential hardship to Defendants.

## V.      Requested Relief.

Plaintiff requests that this Court grant the following relief:

A. Issue Temporary Restraining Order, and Preliminary, Injunction directing the Defendants and all persons/entities in active concert or participation with any of them, be enjoined from the following: (1) intercepting any emails using  the following UOM FunFlicks Emails:

| | | |
|---|---|---|
| Darrell@Funflicks.com | Events@funflicks.com | Chandra@funflicks.com |
| Laura@Funflicks.com | Kenneth@funflicks.com | MB@funflicks.com |

(2) using or disclosing any information obtained or derived from the UOM FunFlicks Emails; (3) keeping active or re-activating the UOM FunFlicks Emails;

B. Issue a Temporary Restraining Order and Preliminary Injunction directing the Defendants and all persons/entities in active concert or participation with any of them, to: (1) immediately deactivate UOM's FunFlick's Email addresses; (2) turnover all documents and

38

electronic communications in their original form consisting of and related to the intercepted

UOM Emails or otherwise generated by or through the use of the intercepted UOM FunFlicks

Emails within 10 days from the date of this Court's Order;  (3) Subject to UOM's and this

Court's approval, and upon the granting a preliminary injunction, order that Defendants to send

an e-mail and a letter via certified mail to each and every UOM customer or prospective

customer whose UOM FunFlicks emails were intercepted by or through one or more of the

Defendants and all persons/entities in active concert or participation with any of them, advising

said person that his/her e-mail was intercepted for purposes of deceiving the person into

purchasing Movie Business Services, from said person other than UOM; with a suitable apology

to UOM or its Customer.

       C.     Set the requirement for a nominal bond of $1.00 dollar; and for other just and
proper relief.

/s/Troy Swanson
Troy C. Swanson
USDC MD Bar #05806
Cipriani & Werner, P.C.
641 Ivy Lane, Suite 600,
Greenbelt, Maryland 20770
Telephone 410-420-0700
Fax #410-420-0222
Email: tswanson@c-wlaw.com
Attorneys for Plaintiffs