# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>ULTIMATE OUTDOOR</td><td>*</td><td></td></tr>
<tr><td>MOVIES, LLC, et al.,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil Case No.: SAG-18-2315</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>FUNFLICKS, LLC, et al.,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

*    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

Plaintiffs Ultimate Outdoor Movies, LLC and Laura Landers ("Plaintiffs") filed suit against Defendants Charles Hunter, Matthew Dias, and FunFlicks Audiovisuals (collectively "the California Defendants"); Todd Severn and FunFlicks, LLC (collectively, "the Severn Defendants"); and James Gaither and NATJAY, LLC (collectively "the Gaither Defendants"). ECF 1. Plaintiffs allege fraud; aiding and abetting; breach of contract; violations of the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-1201 *et seq.*, and the Federal Trade Secrets Act, 18 U.S.C. § 1836; defamation; intentional interference with contract; violations of the Federal Wiretap Act, 18 U.S.C. § 2511, and the Texas Wiretap Act, Tex. Civ. Prac. & Rem. Code Ann. §123.001 *et seq.*; violations of the Federal Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A)-(B); unfair competition; intentional interference with economic relations; and civil conspiracy. ECF 21. Presently pending are the Severn Defendants' Motion to Dismiss for Failure to State a Claim, ECF 29, the Gaither Defendants' Corrected Motion to Dismiss for Failure to State a Claim, ECF 31, and the California Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, ECF 26. Plaintiffs opposed each motion, ECF 32, 44, 46, and the California

Defendants and the Severn Defendants each filed a Reply, ECF 45, 61. The Gaither Defendants did not file a Reply. This Court also granted Plaintiffs' Motion for Leave to File a Supplemental Response in Opposition to the California Defendants' Motion to Dismiss, and will consider Plaintiffs' Supplemental Opposition, ECF 40. ECF 99.

This Court held a hearing on Defendants' Motions on January 23, 2019, ECF 86, and granted Plaintiffs limited jurisdictional discovery as to the California Defendants, ECF 99. The Court also granted Plaintiffs an opportunity to supplement their opposition to the California Defendants' Motion to Dismiss, and granted the California Defendants an opportunity to file a response. ECF 99. After conducting the limited jurisdictional discovery, Plaintiffs supplemented their opposition, ECF 102, and the California Defendants filed a response, ECF 104. On April 10, 2019, the Severn Defendants filed a Third Party Complaint and a Motion for Preliminary Injunction against Darrell Landers ("Darrell Landers") and his company, LND Technologies, LLC ("LND"). ECF 105, 106.

For the reasons stated below, I shall grant in part and deny in part the Severn Defendants' Motion to Dismiss, ECF 29, grant in part and deny in part the Gaither Defendants' Corrected Motion to Dismiss, ECF 31, and grant in part and deny in part the California Defendants' Motion to Dismiss, ECF 26.

## I.    Factual Background[1]

Plaintiff Ultimate Outdoor Movies, LLC ("UOM") is a Texas-based outdoor inflatable movie screen rental company. ECF 21 ¶ 2. UOM was incorporated in Texas in 2010. *Id.* ¶ 56. Plaintiff Laura Landers ("Laura Landers"), a Texas resident, is the sole owner of UOM. *Id.* ¶¶ 1,

---

[1] The facts are derived from Plaintiffs' Amended Complaint, ECF 21, and attached exhibits, ECF 21-1 – 21-18, and from the substantive declarations Defendants submitted in support of their motions, ECF 26-5, 26-6.

56 n.2. Laura Landers's husband, Darrell Landers, is CEO and Vice President of UOM. *Id.* ¶ 56 n.2.

Defendant Todd Severn ("Severn") is the original owner and creator of the outdoor inflatable movie screen rental brand known as FunFlicks. ECF 21 ¶ 48. Severn operated the business as FunFlicks, LLC ("FF-Severn") from 2002 until January 1, 2013. *Id.* During this time, FF-Severn granted non-exclusive licenses to individuals and small business owners, including Darrell Landers in April, 2008, for the purpose of operating a business under the FunFlicks name. *Id.* ¶¶ 49, 55. When UOM was formed in 2010, Darrell Landers transferred his FunFlicks licenses to UOM. *Id.* ¶ 56. As of December 31, 2012, UOM operated FunFlicks businesses in Dallas, Fort Worth, Houston, San Antonio, Oklahoma City, Tulsa, Memphis, Nashville, Huntsville, and Little Rock. *Id.* ¶57. In December, 2012, Darrell Landers incorporated a separate entity, FunFlicks, Inc., in Texas ("FF-Landers"). *Id.* ¶ 58. FF-Landers eventually changed from FunFlicks, Inc. to FunFlicks, LLC. *Id.* ¶ 13. In January, 2013, FF-Landers bought the rights to the FunFlicks brand, including additional FunFlicks territories, from the Severn Defendants through an asset purchase agreement ("2013 APA"), executing a promissory note and granting FF-Severn a security interest in FF-Landers's business assets. *Id.* ¶¶ 15, 58-61. After that transaction, FF-Landers allowed UOM to begin operating additional FunFlicks territories in Maryland, Delaware, and D.C. *Id.* ¶ 61.

In or about the fall of 2017, FF-Landers did not make payment to FF-Severn under the promissory note,[2] and the parties began negotiating a restructuring of the 2013 APA. *Id.* ¶¶ 96-

---

[2] The California Defendants and Severn Defendants argue that Plaintiffs defaulted on the note. ECF 26-1 at 2; ECF 29-1 at 1. Plaintiffs do not concede that FF-Landers defaulted, but instead allege breach by FF-Severn of the representations and warranties contained in the 2013 APA, resulting in FF-Landers withholding payment. ECF 21 ¶ 105. However, the March 3, 2018 Release and Settlement Agreement between FF-Landers and FF-Severn notes that "FF-Landers defaulted in its payment obligations under the APA." ECF 21, Exh. 13.

125. In or about December, 2017, unbeknownst to FF-Landers, FF-Severn sought a replacement buyer, and approached California Defendants Charles Hunter ("Hunter") and Matthew Dias ("Dias") about purchasing the FunFlicks brand through their California-based FunFlicks company, Defendant FunFlicks Audiovisual ("FF-AV"). *Id.* ¶¶ 115-125. Individual Defendants Dias and Hunter are residents of California. ECF 26-5 ¶ 7, 26-6 ¶ 8. Corporate Defendant FF-AV, a company that provides outdoor movie entertainment, was incorporated in California and maintains its principal place of business in Bakersfield, California. ECF 26-5 ¶¶ 3-4, 26-6 ¶¶ 4-5. Dias is the Vice President and Chief Financial Officer of FF-AV, ECF 26-5 ¶ 2, and Hunter is the Chief Executive Officer of FF-AV, ECF 26-6 ¶ 3. FF-AV does not have an office or any employees in Maryland, does not own property in Maryland, does not have a resident agent for service of process in Maryland, does not have a mailing address or telephone number in Maryland, and does not maintain a bank account in Maryland. ECF 26-5 ¶¶ 5-6, 26-6 ¶¶ 6-7. Dias and Hunter have never lived in Maryland, have never owned, rented or leased any real or personal property in Maryland, have never worked or attended school in Maryland, have never paid taxes in Maryland or maintained any type of bank or securities account in the state, and have never traveled to Maryland to participate in any judicial proceedings or arbitrations. ECF 26-5 ¶¶ 8-15, 26-6 ¶¶ 9-16.

On or about December 21, 2017, the California Defendants and FF-Severn executed an asset purchase agreement ("2017 APA"), selling the assets covered under the 2013 APA to the California Defendants. ECF 21 ¶116. The 2017 APA is governed by Maryland law. *Id.* ¶¶ 118, 119, Exh. 4. Plaintiffs allege that the 2013 APA did not cover the after-acquired property of FF-Landers and, when FF-Landers learned of the 2017 APA, FF-Landers and FF-Severn began a second round of negotiations to resolve their remaining disputes over the 2013 APA. *Id.* ¶¶ 129, 130, 139. During those negotiations, FF-Severn had control of the www.FunFlicks.com URL,

held in escrow on a separate DNS server, pursuant to the 2013 APA. *Id.* ¶ 137 (l) n.4. Plaintiffs allege, however, that FF-Landers, not FF-Severn, had control over the "web/email servers containing the FunFlicks email addresses and data." *Id.*

While negotiations were ongoing between FF-Landers and FF-Severn, the California Defendants contacted Laura Landers to discuss UOM's continuation of its license under the FunFlicks brand. *Id.* ¶ 140. Plaintiffs allege that Defendant Hunter promised Laura Landers, over the phone, that he would not "screw" her over. *Id.* ¶ 155. Based on this promise, Plaintiffs allege that UOM refrained from switching its brand from FunFlicks to UOM, and continued to operate under the FunFlicks name without objection from the California Defendants. *Id.* ¶ 157. On March 3, 2018, Darrell Landers and FF-Severn executed a Release and Settlement Agreement ("the Release"), settling their dispute over the 2013 APA. *Id.* ¶¶ 245-255, Exh. 13.

James Gaither worked as an independent contractor for UOM for 6 years. *Id.* ¶ 172. Plaintiffs allege that Gaither was contracted with UOM through December 31, 2018. *Id.* ¶ 175. However, in January, 2018, Gaither formed NATJAY, LLC in Maryland, to operate a movie business. *Id.* ¶ 180. On or about February 5, 2018, Gaither executed a licensing agreement with the California Defendants to operate as a FunFlicks licensee. *Id.* ¶ 182. On February 18, 2018, Gaither and Darrell Landers spoke on the phone about UOM's plans for the 2018 season. *Id.* ¶ 198. On February 20, 2018, UOM switched its brand to "Ultimate Outdoor Movies," and sent a notice to all of its customers about the switch from FunFlicks to UOM, including its new email contacts, using the URL www.ultimateoutdoormovies.com.[3] *Id.* ¶ 206.

On or about February 27, 2018, Plaintiffs allege that Gaither, on behalf of all of the Defendants, sent an email to all FunFlicks customers from UOM's Mid-Atlantic Client List,

---

[3] It seems that this was the second notice to customers, because the Amended Complaint incorrectly states that a second notice was sent to customers on January 24, 2018. ECF 21 ¶ 207.

warning clients that a "Texas business has been marketing outdoor movies using the FunFlicks®
name without authorization." *Id.* ¶ 212. The email also stated, "[y]our events and deposits are at
risk! This out of state company formed in August and is attempting to undermine FunFlicks
business across America. Most importantly, they MAY NOT have infrastructure in Maryland or
other states to handle these events, and they are not registered to conduct business in Maryland."
*Id.* The email was signed by the "FunFlicks Team." *Id.*

On or about March 1, 2018, FF-Severn disconnected the FunFlicks URL link to FF-
Landers's server, and redirected the domain to the California Defendants. *Id.* ¶¶ 259, 260.
Plaintiffs allege that the California Defendants "recreate[d] related directional protocols on its own
separate e-mail/web server" for emails sent to "@funflicks.com." *Id.* ¶¶ 260-262. On or about
April 27, 2018, a former UOM client, "Megan," received an email from Gaither in response to
Megan's inquiry, which was sent to "events@funflicks.com" and addressed to "Kenneth," a UOM
employee. *Id.* ¶ 274. After receiving Gaither's response, Megan booked her event with Gaither
and NATJAY, LLC, and not with UOM. *Id.* ¶¶ 275, 276, Exh. 16. On or about June 14, 2018,
Darrell Landers sent an email to "darrell@funflicks.com," posing as a client seeking FunFlicks
services for events in Alabama, Arizona, California, Colorado, Connecticut, Florida, Illinois,
Indiana, Louisiana, North Carolina, and Texas. *Id.* ¶¶ 269, 270, Exh. 14. Darrell Landers never
received the email he sent to his former email address, but, as the fictitious client, Darrell Landers
received a response from Severn. *Id.* ¶ 271.

On or about May 22, 2018, Hunter incorporated "Ultimate Outdoor Movies, LLC" in
California. *Id.* ¶¶ 279-282, Exh. 18. Plaintiffs filed suit in this Court on July 27, 2018. ECF 1.
On April 10, 2019, the Severn Defendants filed a Third Party Complaint and Motion for

Preliminary Injunction against Darrell Landers and his company, LND, alleging breach of contract and seeking specific performance as well as injunctive relief. ECF 105, 106.

## II. Personal Jurisdiction over California Defendants

### A. 12(b)(2) Motion to Dismiss Standard

The California Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(2) challenges this Court's personal jurisdiction over them. Under Rule 12(b)(2), the burden is "on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)). When "a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md.*, 334 F.3d at 396 (citing *Combs*, 886 F.2d at 676). To determine whether the plaintiff has met this burden, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676. The court need not "look solely to the plaintiff's proof in drawing" all reasonable inferences in plaintiff's favor, and may also look at the defendant's proffered proof and assertions regarding defendant's lack of contacts with the forum state. *Mylan Labs., Inc.*, 2 F.3d at 62. "When the existing record is inadequate to support personal jurisdiction over a defendant, the plaintiff is entitled to jurisdictional discovery if it can demonstrate that such discovery would yield 'additional facts' that would 'assist the court in making the jurisdictional determination.'" *FrenchPorte IP, LLC v. Martin Door Mfg., Inc.*, Civil Action No. TDC-14-0295, 2014 WL 4094265, at *5 (D. Md. Aug. 14, 2014) (first quoting

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1323 (Fed. Cir. 2005); and then citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (Fed. Cir. 2003) ("[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous.'")).

To exercise personal jurisdiction over a non-resident defendant, a court must determine that (1) the exercise of jurisdiction is authorized under the state's long-arm statute, pursuant to Federal Rule of Civil Procedure 4(k)(1)(A); and (2) the exercise of jurisdiction conforms to the Fourteenth Amendment's due process requirements. *Carefirst of Md.*, 334 F.3d at 396. When interpreting the reach of Maryland's long-arm statute, a federal district court is bound by the interpretations of the Maryland Court of Appeals. *See Carbone v. Deutsche Bank Nat'l Tr. Co.*, Civil Action No. RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016); *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130, 135-36 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985); *see also Mylan Labs.*, 2 F.3d at 61 (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 178 (1938)). Moreover, courts must address both prongs of the personal jurisdiction analysis, despite Maryland courts consistently holding that "the state's long-arm statute is coextensive with the limits of personal jurisdiction set out by the due process clause of the Constitution." *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *see CSR, Ltd. v. Taylor*, 411 Md. 457, 472, 984 A.2d 492, 501 (2009) (noting that the personal jurisdiction analysis "entails dual considerations"); *Carefirst of Md.*, 334 F.3d at 396.

Under the first prong, the plaintiff must identify a provision in the Maryland long-arm statute that authorizes jurisdiction. *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001). Under the second prong, "due process requires only that . . . a defendant . . . have certain minimum contacts . . . such that the maintenance of the suit does not

offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milleken v. Meyer*, 311 U.S. 457, 463 (1940)). This "minimum contacts" analysis depends on the number and relationship of a defendant's contacts to the forum state, and whether the present cause of action stems from the defendant's alleged acts or omissions in the forum state. *Id.* at 316-19.

Finally, a court may exercise two types of personal jurisdiction, "general" or "specific." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). "General" jurisdiction is a fairly limited concept, since it only arises where "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against [defendant] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). In the context of a corporation, the paradigm bases for general jurisdiction are "the place of incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). The *Daimler* court clarified that while those paradigms are not necessarily the only bases for general jurisdiction, it would be "unacceptably grasping" to approve the exercise of general jurisdiction wherever a corporation, "engages in a substantial, continuous, and systematic course of business." *Id.* at 137-38 (declining to find general jurisdiction lies in every state in which a corporate defendant has "sizable" sales).

"Specific" jurisdiction arises when there is an "affiliation between the forum and the underlying controversy." *Goodyear*, 564 U.S. at 919; *Carefirst of Md.*, 334 F.3d at 397. To assess specific jurisdiction, the Fourth Circuit considers: "(1) the extent to which the defendant

purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

## B. Analysis

The California Defendants argue that this Court does not have general or specific personal jurisdiction over them. ECF 104. Although Plaintiffs appear to concede that there is no basis for general jurisdiction, they maintain that this Court has specific personal jurisdiction over the California Defendants. ECF 102. As bases for personal jurisdiction, Plaintiffs have cited the conspiracy theory of jurisdiction, and four provisions in Maryland's long-arm statute: Maryland Courts and Judicial Proceedings Article ("MJCP") § 6-103(b)(1) (transacting business), § 6-103(b)(2) (conferring personal jurisdiction over a party who "[c]ontracts to supply goods, food, services, or manufactured products in the State"), § 6-103(b)(3) (causing tortious injury), and § 6-103(b)(4) (causing tortious injury by act or omission outside the state if deriving substantial revenue from "goods, food, services, or manufactured products used or consumed" in Maryland). ECF 32 at 5-6, ECF 40 at 1. For the reasons described below, Plaintiffs have presented a prima facie case that the California Defendants' actions in Maryland gave rise to Plaintiffs' causes of action.

### 1. Maryland's Long-Arm Statute

Under Maryland's long-arm statute, the lynchpin of a plaintiff's assertion of specific jurisdiction is that the claims arise out of acts performed in Maryland. *See* MJCP § 6-103(a). The statute provides jurisdiction over someone who performs such acts directly or through an agent.

*See* MJCP § 6-103(b).  Only one provision of the long-arm statute needs to be satisfied for this Court to exercise jurisdiction.  *CSS Antenna, Inc. v. Amphenol-Tuchel Electronics, GmbH*, 764 F. Supp. 2d 745, 748-49 (D. Md. 2011) (citing *Bahn v. Chicago Motor Club Ins. Co.*, 634 A.2d 63, 67 (Md. Ct. Spec. App. 1993)).  As noted below, Plaintiffs have made a prima facie showing as to §§ 6-103(b)(1) and 6-103(b)(4).

Under Section 6-103(b)(1), the Court may exercise personal jurisdiction over a party who "[t]ransacts any business or performs any character of work or service in the State."  To constitute transacting business under this subsection, a defendant's actions must "'culminate in purposeful activity within the State.'"  *Bahn*, 634 A.2d at 67 (quoting *Sleph v. Radtke*, 545 A.2d 111, 115, *cert. denied*, 550 A.2d 381 (Md. 1988)).  "Although a defendant need not have been physically present in Maryland, the plaintiff must show 'some purposeful act in Maryland in relation to one or more of the elements of [the] cause of action.'"  *Aphena Pharma Solutions-Maryland LLC v. BioZone Labs., Inc.*, 912 F. Supp. 2d 309, 315 (D. Md. 2012) (quoting *Talegen Corp. v. Signet Leasing & Fin Corp.*, 657 A.2d 406, 409 n.3 (Md. Ct. Spec. App. 1995)) (footnotes omitted).  Maryland courts construe the phrase "transacting business" narrowly, "requiring, for example, significant negotiations or intentional advertising and selling in the forum state."  *Id.* at 315.

Under Section 6-103(b)(4), the Court may exercise personal jurisdiction over a party who causes tortious injury by act or omission outside the state if the party "engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State."

Plaintiffs argue that the California Defendants transacted business in Maryland and derived substantial revenue from business in Maryland by "delegating [their] contractual duties owed to NATJAY" to the Severn Defendants, placing the Severn Defendants "in charge of the 'catch all'

device used for intercepting the Former FunFlicks Email addresses," and having an "ongoing and active relationship in the State of Maryland with FF Gaither." ECF 102 at 2. Plaintiffs rely on the documents produced during jurisdictional discovery and the California Defendants' Answers to Interrogatories to support their claims. Specifically, Plaintiffs highlight the terms of the California Defendants' licensing agreement with NATJAY, and the California Defendants' independent contractor agreement with FF-Severn. ECF 102 at 3-10; ECF 102-1 at FFAV000060-63, FFAV000091-102.

The Trademark License Agreement between the California Defendants and the Maryland LLC NATJAY imposes several contractual duties on NATJAY, including an initial nonrefundable payment of $230,000.00, a minimum monthly royalty payment of either 6% of NATJAY's monthly gross sales or $287.50, whichever is greater, a three-year non-competition agreement, a record-keeping requirement of gross sales for a period of seven years, and the provision of such records for inspection at NATJAY's place of business upon notice by the California Defendants. ECF 102-1 at FFAV000091-102. The existence of a license agreement between a non-resident defendant licensor and a Maryland licensee does not automatically confer personal jurisdiction over the defendant, but additional facts that indicate purposeful activity in the state may suffice to subject the defendant to personal jurisdiction. ECF 98 at 9-10 (citing *FrenchPorte IP, LLC v. Martin Door Mfg., Inc.*, Civil Action No. TDC-14-0295, 2014 WL 4094265, at *12 (D. Md. Aug. 14, 2014); *Choice Hotels Int'l, Inc. v. Madison Three, Inc.*, 23 F. Supp. 2d 617, 621 (D. Md. 1998)).

Plaintiffs have provided additional facts that indicate purposeful activity in Maryland related to Plaintiffs' claims of unfair competition and intentional interference with economic relations. The heart of Plaintiffs' case is the allegation that the Defendants used a "catch-all" account to "intercept" emails sent to their former FunFlicks accounts, and then used those emails

to usurp business intended for Plaintiffs by referring the customers to NATJAY. In their Answer to Plaintiffs' Interrogatory Number 1, the California Defendants state that "Defendants Matthew Dias, Chad Hunter, and Todd Severn had access to the catch-all account." ECF 102-3 at 4. They also state that, because more than one person had access to the account, "the identity of the forwarder of any specific email is unclear, unless the sender signed the email, which typically did not occur given the informal nature of the communications." *Id.* at 4-5. They do, however, list thirteen emails that were forwarded from the catch-all account to Gaither between March 1, 2018 and February 27, 2019. *Id.* at 5-6. On eight of the thirteen emails, Severn was listed as an additional recipient. *Id.* These facts, viewed in the light most favorable to Plaintiffs, establish a prima facie case that California Defendants Dias and Hunter played some role in directing emails intended for Plaintiffs to Gaither and his Maryland FunFlicks licensee, NATJAY, actions which Plaintiffs contend constitute unfair competition and intentional interference with economic relations.

In addition, the California Defendants' Independent Contractor Agreement ("IC Agreement") with FF-Severn, and the California Defendants' Interrogatory Answers, reflect a close connection, suggestive of an agency relationship. *See* ECF 102-1 at FFAV000060-63; ECF 102-3 at 3-16. The IC Agreement provides that Severn's Maryland FunFlicks licensee, or FF-Severn, is paid $50,000 per year from January 1, 2019, plus 10% commissions of gross sales generated from FF-AV's contracting parties. ECF 102-1 at FFAV000060-63. The IC Agreement also describes the services provided by FF-Severn as "management services," and defines FF-Severn as an independent contractor. *Id.* In their original and supplemental Answers to Plaintiffs' Interrogatories, the California Defendants explain that Severn "has done work related to search engine optimization, website design, maintenance of the catch-all account inbox, new licensee

support, licensee business development, and licensee support," and that "Severn provided 'first line of defense' support to all existing licensees, which included fielding questions regarding changes to the website and general operational support." ECF 102-3 at 13; ECF 102-4 at 4. In 2018, Severn also provided training for two new licensees in Kentucky and Colorado. ECF 102-4 at 4.

The California Defendants maintain that Severn's independent contractor work is insufficient to create jurisdiction because he "is merely an independent contractor for FunFlicks Audiovisuals, who happens to reside in Maryland and does remote work for FunFlicks Audiovisuals by providing licensee support, and performing work on the website and search engine optimization." ECF 104 at 12. The label of "independent contractor" does not automatically exclude the possibility of an agency relationship to confer jurisdiction over a non-resident defendant, nor, on the other hand, do an agent's in-state activities automatically confer jurisdiction over a non-resident defendant. *See Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130, 142 (D. Md. 1981) ("The use of the label 'independent contractor does not aid in determining whether the plaintiffs' relationship with [defendant] is such that their in-state acts can be attributed to [defendant] for jurisdictional purposes. … The distinguishing factor concerns the principal's right to control the agent's physical conduct."); *Zavian v. Foudy*, 747 A.2d 674, 699 (Md. Ct. Spec. App. 2000) ("We are not saying that an agent's in-state activities for a nonresident principal may never be attributed to its principal. We are concluding simply that under the present circumstances, appellant's Maryland activities as agent for the nonresident appellees does not subject them to Maryland's long arm statute."). The California Defendants rely on *Beyond Systems, Inc. v. Kennedy Western Univ.*, where the court declined to exercise personal jurisdiction over an online education company defendant because "the cause of action—sending unsolicited bulk e-mail—

does not arise from Defendants' contacts." Civil Action No. DKC 2005-2446, 2006 WL 1554847, at *6 (D. Md. May 31, 2006). The court noted "the lack of a showing of an agency relationship between Defendants and the senders of the e-mails in question." *Id.* at *8.

Here, in contrast, the Plaintiffs allege that personal jurisdiction over the California Defendants arises from their "interception of emails directed at Maryland Resident[s]," and the California Defendants acknowledge both receipt and use of emails that were sent to, among other addresses, Laura Landers's email address, "Laura@FunFlicks.com." ECF 21 ¶ 42; *see* ECF 102-3 at 4-6 ("the California Defendants identify the following emails which were deposited into [FF-AV's] catch-all email account after being addressed to either MB@funflicks.com, Events@Funflicks.com, Laura@Funflicks.com, Darrell@Funflicks.com, Kenneth@Funflicks.com, or Chandra@Funflicks.com, and which were subsequently forwarded from the catch-all account to Gaither"). The emails identified by the California Defendants were neither unsolicited nor bulk emails, but instead appear to be specific inquiries for movie rental services. *See* 102-3 at 5-6. While the exact extent of the California Defendants' involvement in this email redirection, and the revenue derived from it, is still unclear, they do concede that the list of emails representing "11 unique Maryland contacts [] were sent to Gaither by either the California Defendants or Severn from the catch-all account." *Id.* at 6. As a result, Plaintiffs have adequately alleged that the California Defendants "derive substantial benefits from NATJAYS [sic] FunFlicks Business" through "royalty payments received from NATJAY" and the California Defendants "providing website/email services, to NATJAY for a fee." ECF 102 at 3; *see* ECF 21 ¶ 275 ("By the Defendants intercepting, the UOM FunFlicks E-mail, Mr. Gaither was able to book an event with Megan when she was trying to book an event with Kenneth at UOM.").

Taking the allegations and available evidence in the light most favorable to the Plaintiffs, the Court is satisfied that Plaintiffs have made a prima facie showing that the California Defendants have transacted business in Maryland and derived substantial revenue therefrom through their purposeful activity in the state, including their licensee agreement with NATJAY, their relationship with Severn and FF-Severn, and their participation in redirecting emails that were sent to Plaintiffs' former accounts, subjecting them to personal jurisdiction at this stage under Sections 6-103(b)(1) and (b)(4).

### 2. Conspiracy Theory of Jurisdiction[4]

Plaintiffs also assert that the California Defendants are subject to personal jurisdiction under the conspiracy theory of jurisdiction. Under this theory, "an out-of-state party involved in a conspiracy who would lack sufficient, personal, 'minimum contacts' with the forum state if only the party's individual conduct were considered nevertheless may be subject to suit in the forum jurisdiction based upon a co-conspirator's contacts with the forum state." *Mackey*, 892 A.2d at 484. To establish personal jurisdiction under this theory, a plaintiff must show:

(1) two or more individuals conspire to do something
(2) that they could reasonably expect to lead to consequences in a particular forum, if
(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and
(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state

*Id.* at 486. This theory of jurisdiction also comports with the requirements of constitutional due process. *Gold v. Gold*, Civil No. JKB-17-483, 2017 WL 2061480, at *2 (D. Md. May 15, 2017)

---

[4] In their Response to Plaintiffs' Supplemental Jurisdictional Response to the California Defendants' Motion to Dismiss, the California Defendants contend that the Plaintiffs abandoned their conspiracy theory of jurisdiction argument because they did not renew it in their Supplemental Jurisdictional Response. ECF 104 at 8 n.9. The California Defendants do not cite to any Federal Rule or case law to support this contention, and nothing in this Court's January 31, 2019 Order indicated that Plaintiffs needed to restate their original bases for jurisdiction to preserve them. ECF 99. Thus, the Court will review all jurisdictional bases asserted by Plaintiffs, including the conspiracy theory of jurisdiction asserted in Plaintiffs' original Opposition to the California Defendants' Motion to Dismiss, ECF 32 at 3-4.

(citing *Mackey*, 892 A.2d at 487). If all four of the elements above are present, "a party may fairly be said to have purposefully established minimum contacts in a forum such that exercise of jurisdiction over [the party] would not be 'random, fortuitous, or attenuated,' thus satisfying constitutional demands." *Id.* (quoting *Mackey*, 892 A.2d at 491).

As will be discussed fully below, Plaintiffs have alleged a civil conspiracy, in that the California Defendants, the Severn Defendants, and the Gaither Defendants agreed to divert "customers, monies, business revenues, and business opportunities away from Plaintiffs." ECF 21 ¶¶ 514-522. They have also alleged overt acts by the Defendants, namely their redirection of the emails allegedly intended for Plaintiffs. *Id.* ¶ 137. To satisfy the second element of the conspiracy theory of jurisdiction, "the required showing is that a reasonable person in the defendant's position would have anticipated a co-conspirator committing an act in furtherance of the conspiracy within the forum jurisdiction." *Gold*, 2017 WL 2061480, at *3 (citing *Mackey*, 892 A.2d at 486). This "hypothetical 'reasonable person' must form the pertinent expectation *at the time the agreement with the co-conspirator was formed*." *Id.* (quoting *Mackey*, 892 A.2d at 489). This requirement ensures that the "out-of-forum co-conspirator has 'purposely availed' herself of the privilege of conducting activities in the forum and therefore has fair warning that she could be subject to suit there." *Id.* (citing *Mackey*, 892 A.2d at 495). Plaintiffs have satisfied this element by alleging that the California Defendants conspired with FunFlicks licensees in Maryland, and they should reasonably have known at the time of the alleged agreement that a portion of the conspiracy was likely to occur in Maryland, as the Severn Defendants and Gaither Defendants resided in and operated their businesses in Maryland.

Accordingly, Plaintiffs have met their burden of presenting a prima facie showing to establish personal jurisdiction under the conspiracy theory of jurisdiction.

### 3. Federal Due Process

Once a basis has been established for personal jurisdiction under Maryland's long-arm statute, the Court must then decide whether exercise of personal jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. The relevant question here is whether an out of state defendant has "certain minimum contacts" with the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457 (1940)). The Supreme Court has held that "even a single act" between an in-state resident and a non-resident defendant may suffice to establish personal jurisdiction, as long as it creates a "substantial connection" with the forum. *Burger King v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

The Court is satisfied that the Plaintiffs have established a prima facie case that the California Defendants have the requisite minimum contacts with Maryland to comport with federal due process. The allegations of the license agreement with NATJAY, the IC agreement with FF-Severn, and the California Defendants' participation in the redirection of emails all serve to support a substantial connection between the California Defendants and Maryland. *See, e.g. A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 795 F. Supp. 2d 365, 371-72 (D. Md. 2011) (finding minimum contacts consistent with due process based on a franchise contract that "produced an elaborate, ongoing relationship between Maryland-based [plaintiff] and New York-based [defendant], despite the fact that the franchise restaurant itself was slated to operate in Washington, D.C."); *Choice Hotels Int'l, Inc.*, 23 F. Supp. 2d at 621 (franchise agreement "imposes continuing significant contractual duties upon the franchisee, e.g., reporting and payment obligations"). Moreover, as alleged, the California Defendants' contacts were not "random, fortuitous, or

attenuated," but were the result of negotiated and purposeful actions with their Maryland licensees. *See Burger King*, 471 U.S. at 476 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770. 774 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980) (internal quotation marks omitted)). Accordingly, under the prima facie standard, the exercise of personal jurisdiction over the California Defendants under Sections 6-103(b)(1) and (b)(4) comports with federal due process.

The Court is mindful that, with the benefit of full discovery, the Plaintiffs may be unable to show, by a preponderance of the evidence, that the California Defendants' actions suffice to establish personal jurisdiction over them in Maryland. *See New Wellington Financial Corp. v. Flagship Resort Development Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) ("[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing") (emphasis in original) (internal quotation marks and citation omitted). Accordingly, this decision does not preclude the California Defendants from renewing their 12(b)(2) motion after the close of discovery, if appropriate.

## III.    Motions to Dismiss

### A. 12(b)(6) Motion to Dismiss Standard

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by

a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is

improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to

the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman* ).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "'so long as they are integral to the complaint and authentic.'" *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004).

Accordingly, when resolving a Rule 12(b)(6) motion, a court may consider certain exhibits, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ." *Goines*, 822 F.3d at 166 (citations omitted); *see also U.S. ex rel. Oberg*, 745 F.3d at 136; *Anand*, 754 F.3d at 198; *Am. Chiropractic Ass'n*, 367 F.3d at 234; *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which

his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

## B. March 3, 2018 Settlement Agreement and Release

The Severn Defendants and the Gaither Defendants argue that Plaintiffs released all claims against them pursuant to the March 3, 2018 Release and Settlement Agreement ("the Release"). ECF 29-1 at 7-10; ECF 31-1 at 3-9; ECF 21, Exh. 13. The Release, attached as an exhibit to the Complaint, was signed by Darrell Landers, individually and on behalf of FF-Landers, and by Severn, individually and on behalf of FF-Severn, all of whom who are defined in the Release as "the Parties." ECF 21, Exh. 13 at 1-10. The "Mutual General Release" provision provides,

> Each of the parties, through the undersigned, on behalf of themselves and their successors in interest, assigns, officers, shareholders, agents, employees, and partners, irrevocably and unconditionally releases and discharges each of the Parties of any and all contracts, agreements, promises, indebtedness, obligations, sums owed, liability,

claims, and/or causes of action, including any claims for attorneys' fees, that they, he, or it may have, whether any of the foregoing are known or unknown, that in any way raise from or relate to the APA, the Seller Take Back Financing Note, the Security Agreement, and any associated agreements and instruments, the Default Notice, the Sale Notice, the Third Party Sale, the Deficiency, or any decision, event, act, transaction, agreement, contract, or occurrence that took place or was executed prior to the date of this Agreement. The Parties understand that this mutual release contained in this Agreement includes all claims they have ever had or may now have against any other Party up to the date of this Agreement, including but not limited to, all claims arising out of or related [sic] the Parties' business, relationship and/or agreements, all claims for breach of express or implied contract, and all other federal, state, or local statutory and/or common law claims. . . . Any and all claims or potential claims or causes of action that either Party has, may have, or that may arise in the future from events occurring after the date of this Agreement are not meant to be covered by the mutual release of this Agreement. <u>This is a general release for acts, agreements, events, and claims between the parties predating this Agreement.</u> Nothing in this Section shall be deemed to release any claims that either party has or may have against the Third Party Purchaser.

*Id.* ¶ 8.  The Release is governed by Maryland law.  *Id.* ¶ 13.  Under Maryland law, a general release bars all future claims against all other entities associated with the events that gave rise to a lawsuit.  *Peters v. Butler*, 253 Md. 7, 251 A.2d 600, 602 (1969) (citing *Pemrock, Inc. v. Essco Co.*, 252 Md. 374, 249 A.2d 711 (1969)); *see also Jacobs v. Venali, Inc.*, 596 F. Supp. 2d 906, 911 (D. Md. 2009).  General releases differ from limited or special releases, which release only certain parties and/or certain claims from future litigation.  *See Fed. Sav. & Loan Ins. Corp. v. Reeves*, 816 F.2d 130, 134 (4th Cir. 1987); *Virginia Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262, 265 (4th Cir. 1971).  However, a general release extends only to those claims within the parties' contemplation upon the release's execution.  *Auslander v. Helfand*, 985 F. Supp. 576, 580 (D. Md. 1997) (citing *Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183 (1941).

The Court must determine whether the Severn Defendants and the Gaither Defendants are subject to the Release.[5]  Under Maryland law, "[r]eleases are interpreted according to established principles of contract interpretation."  *Auslander*, 988 F. Supp. at 580 (citing *Bernstein v. Kapneck*,

---

[5] The California Defendants do not argue that they are covered by the Release.

290 Md. 452, 459, 430 A.2d 602 (1981)). Thus, the Court must "construe the release to effectuate the parties' intentions." *Id.* (citing *Panamerican Consulting Co. v. Broun*, 238 Md. 548, 550, 209 A.2d 575 (1965)). If the release's language is clear and unambiguous, the Court will afford the words their plain and ordinary meaning, and will not consider parol or extrinsic evidence. *Id.* (citing *Bernstein*, 290 Md. at 459, 430 A.2d 602).

The construction of an unambiguous contract is for the Court alone to determine. *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620, 630 (Md. 2001). Thus, if the Court determines that a contract is unambiguous on a dispositive issue, "it may then properly interpret the contract as a matter of law." *Cochran v. Norkunas*, 919 A.2d 700, 709 n.8 (Md. 2007) (quoting *Wash. Metro Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007)).

A written contract is not ambiguous "simply because, in litigation, the parties offer different meanings to the language." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 952 (Md. 2007). Rather, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999) (citing *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 578 A.2d 1202, 1208 (Md. 1990)). When determine whether a contract is ambiguous, the Court will consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Id.* (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)). If the terms of a contract are ambiguous, the court may consider extrinsic evidence and parol evidence to ascertain the intentions of the parties. *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 619 (Md. 1995).

Here, the Release explicitly extends to the named parties: Darrell Landers, FF-Landers, Severn, FF-Severn, and all of their "successors in interest, assigns, officers, shareholders, agents,

employees, and partners." ECF 21, Exh. 13 ¶ 8.  Accordingly, the Severn Defendants are subject to the Release and its terms, to the extent that Plaintiffs' claims against them rely on events occurring before March 3, 2018.[6]  However, because Plaintiffs allege conduct by the Severn Defendants after March 3, 2018, the Court will consider Plaintiffs' claims against the Severn Defendants that rely on facts post-dating the Release.

The Gaither Defendants argue that the Release also bars claims by Plaintiffs against them, because the Gaither Defendants were "contemplated" as parties in the Release, and because NAYJAY, LLC is a "direct and natural successor in interest of Severn and FF-Severn" as a licensee of the FunFlicks mark once owned by the Severn Defendants.  ECF 31-1 at 11.  In support, the Gaither Defendants cite to several cases interpreting contractual releases.  *Id.* at 10-14 (citing *Pantazes v. Pantazes*, 77 Md. App. 712, 551 A.2d 916 (1989); *Jacobs v. Venali, Inc.*, 596 F. Supp. 2d 906, 911-13 (D. Md. 2009); *Krazek v. Mountain River Tours, Inc.*, 884 F.2d 163, 165-66 (4th Cir. 1989)).  These cases, however, are readily distinguishable, as they either involve parties asserting protection from releases to which they were identified as parties, or involve releases with distinct language releasing "all other parties."  *See Pantazes*, 551 A.2d at 918-19 ("language releasing 'all other persons, firms and corporations' discharges remaining tort-feasors even though they are not named in the release" (quoting *Ralkey v. Minnesota Mining & Mfg. Co.*, 63 Md. App. 515, 525, 492 A.2d 1358 (1985)); *Jacobs*, 596 F. Supp. 2d at 911-12 (release that released all "subsidiaries, predecessors, successors, assigns, partners, agents, affiliates of any kind, officers, directors, employees, attorneys, or any person acting on [party's] behalf from any and all claims" barred claims against all defendants because "every defendant named in the present suit was an officer, director, employee, affiliate, or agent of [party] before the release was signed"); *Krazek*,

---

[6] Specifically, Counts VII and XII as to the Severn Defendants are barred by the Release.

884 F.2d at 166 ("the release signed by [plaintiff] did not limit itself to injures arising out of the dangers inherent in rafting or the negligence of her fellow rafters").  As discussed above, the Release in this case specifically identifies the parties bound by the agreement, and does not include language releasing "all other" parties, persons, firms, licensees, subsidiaries, or corporations.

Accordingly, the Gaither Defendants are not subject to the Release, because neither Gaither nor NATJAY, LLC is a successor in interest, assign, officer, shareholder, agent, employee, or partner of Darrell Landers, FF-Landers, Severn, or FF-Severn.  Moreover, Gaither is specifically mentioned elsewhere in the Release, but not defined as a party, further suggesting that he was not included among the parties bound in the agreement.  ECF 21, Exh. 13 at 5 ("[T]he Severn entities will not voluntarily aid, abet, collude with, or conspire with, any individual or entity, including, without limitation, James Gaither, with respect to bringing or litigating any claim or cause against the Landers Entities based on any conduct or event that occurred prior to the Effective Date of this Agreement.").  Accordingly, the Court will consider all of Plaintiffs' claims against the Gaither Defendants.

### C.  Piercing the corporate veil

Hunter, Dias, Severn, and Gaither also argue that Plaintiffs' claims must be dismissed against them, because Plaintiffs cannot pierce the corporate veil to hold them liable as individuals. ECF 26-1 at 4-5; ECF 29-1 at 11-16; ECF 31-1 at 9-11.  Maryland courts permit corporate veil piercing upon either a showing of fraud, or a showing of the need to enforce a paramount equity. *See Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 306-307, 728 A.2d 783, 789 (1999).  In alleging fraud as the basis for veil piercing to reach an individual, a plaintiff must show that the individual used corporate entities to perpetrate a fraud against the plaintiff.  *See Antigua Condo. Ass'n v. Melba Investors Atl., Inc.*, 307 Md. 700, 735,

517 A.2d 75, 93 (1986); *Harte-Hanks Direct Mktg./Baltimore, Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 514-15 (D. Md. 2004). Moreover, where a corporation is used as a "mere shield" for perpetrating the fraud, piercing may be proper. *See Bart-Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 309, 340 A.2d 225 (1975); *Dixon v. Process Corp.*, 38 Md. App. 644, 651, 382 A.2d 893, 898 (1978); *Colandrea v. Colandrea*, 42 Md. App. 421, 432-33, 401 A.2d 480, 486-87 (1979).

Here, because the case is in the early, pre-discovery stage of litigation, the Court is unable to determine from the facts alleged whether the corporations, the individuals, or both, were primarily responsible for the actions alleged. Accordingly, the counts that survive the motions to dismiss will remain against both the individuals and the corporate entities, and the parties may renew their corporate veil arguments at a later stage in the litigation.

### D. Counts I and V - Fraud/Aiding and Abetting

In Count I, Plaintiffs allege that Defendants Hunter and FF-AV committed fraud, and that the remaining Defendants aided and abetted Hunter and FF-AV's fraud. ECF 21 ¶¶ 294-316. In Count V, Plaintiffs allege that Gaither committed fraud, and that the Severn Defendants and the California Defendants aided and abetted Gaither's fraud. ECF 21 ¶¶ 379-400.

In Maryland, the elements of fraud are as follows: (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation. *See Hoffman v. Stamper*, 385 Md. 1, 28, 867 A.2d 276, 292 (2005). To establish aiding and abetting, a plaintiff must show: (1) a violation of the law by

the principal; (2) that the defendant knew about the violation; and (3) that the defendant gave substantial assistance or encouragement to the principal to engage in tortious conduct. *Christian v. Minnesota Mining & Mfg.*, 126 F. Supp. 2d 951 (D. Md. 2001) (citing *Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 186, 665 A.2d 1038, 1043 (1995)).

Plaintiffs' fraud claim against Hunter and FF-AV rests on Hunter's statements to Darrell and Laura Landers that "all that mattered" to Hunter was to have UOM stay on as a FunFlicks licensee, that he promised not to "screw" the Landerses over, and that he had concerns about who would run the Maryland territory, but had "no idea" about relicensing the Texas FunFlicks territory. ECF 21 ¶¶ 141, 155. Hunter's statements alone are too indefinite to state a claim for fraud. "Maryland law is clear that to support an action for fraud, 'mere vague, general, or indefinite statements are insufficient, because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements.'" *Bancroft Commercial, Inc. v. Goroff*, No. CCB-14-2796, 2014 WL 7409489, at *6 (D. Md. Dec. 31, 2014) (quoting *Fowler v. Benton*, 229 Md. 571, 185 A.2d 344, 349 (1962)).

Plaintiffs' fraud claim against Gaither also fails. Plaintiffs allege that Gaither committed fraud by (1) his February 14, 2018 text message to Darrell Landers, denying contact with Severn, and (2) his statement on or about February 18, 2018, indicating that he was looking forward to working with UOM in 2018. ECF 21 ¶¶ 380-383. For the same reasons that Hunter and FF-AV's statements do not rise to the level of fraud, Gaither's statements are also insufficient to constitute fraud.

Because the underlying fraud claims against Hunter, FF-AV, and Gaither fail to state a claim, the Plaintiffs' claims for aiding and abetting by the remaining Defendants must also fail. *See Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 696-97 (D. Md. 2012)

(aiding and abetting "is not independently actionable: there must be underlying tortious activity" (citing *Alleco, Inc.*, 340 Md. 176, 665 A.2d 1030)). Accordingly, all Defendants' Motions to Dismiss must be granted as to Counts I and V.

### E. Count II – Breach of Contract

In Count II, Plaintiffs allege that Gaither breached his contract with UOM by breaching the implied covenant of good faith and fair dealing. ECF 21 ¶¶ 317-331. To allege breach of contract, a plaintiff must plead "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank*, *N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001). In Maryland, the key to determining whether there is a contract is "manifestation of mutual assent." *Kabba v. Rent-A-Center, Inc.*, 730 F. App'x 141, 143 (4th Cir. 2018) (citing *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n Inc.*, 441 Md. 290, 302 (2015)). "Importantly, an acceptance may be manifested by actions as well as by words." *Galloway v. Santander Consumer USA, Inc.*, 819 F. 3d 79, 85 (4th Cir. 2016) (citations omitted).

Here, Plaintiffs allege the existence of a contract between Gaither and UOM, resulting from an email sent by Gaither on February 25, 2017 and the subsequent acceptance by Darrell Landers. ECF 21 ¶¶ 172-175, 318-322. In the email, Plaintiffs allege that Gaither submitted a written proposal to outline his offer of services to UOM, stating: "Here is my rough draft proposal which can be inserted into an official agreement once the terms are approved." *Id.* ¶ 318. The email suggested a "1 year contract (January 1 through December 31) automatically renewable contract unless 30-day notice is provided by either party." *Id.* The terms included payment terms and job responsibilities. *Id.* On February 27, 2017, on behalf of UOM, Darrell Landers emailed Gaither and said, "I think this is an excellent overview of the responsibilities and will be a good foundation for inserting into an annual contract agreement. I think the comp plan is fair and is inline with

what were [sic] budgeting for the year. I'll send you a 1099 Contractor Agreement with this language added for comp and job responsibilities." *Id.* ¶ 320. No formal contract was ever exchanged, but, on or about May, 1, 2017, UOM began paying Gaither in accordance with the terms that had been outlined in the emails. *Id.* ¶¶ 321-322. At the end of 2017, neither party gave notice to terminate the arrangement. *Id.* ¶ 323. Thus, Plaintiffs contend that Gaither was under contract with them through the 2018 calendar year, and suggest that he violated his implied covenant of good faith and fair dealing. *Id.* ¶¶ 324-328.

Assuming all facts pled are true, the Plaintiffs have adequately pled a breach of contract claim. This case is analogous to *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n Inc.*, in which the parties made a preliminary agreement in a Letter of Intent as to terms, but contemplated a more formal agreement. 441 Md. 290. In *Falls Garden*, the Maryland Court of Appeals determined that the Letter of Intent was enforceable as a contract, applying the following test:

> (1) the language of the preliminary agreement, (2) the existence of open terms, (3) whether partial performance has occurred, (4) the context of the negotiations, and (5) the custom of such transactions, such as whether a standard form contract is widely used in similar transactions.

441 Md. at 302 (quoting *Cochran v. Norkunas*, 398 Md. 1, 15, 919 A.2d 700, 708-09 (2007)). Based on the facts of the case, the court found that the Letter of Intent was "inclusive and definite as to all material terms." *Id.* at 307.

For the purposes of a motion to dismiss, then, in this case, Plaintiffs have sufficiently alleged the existence of a contract with Gaither and potential breach by Gaither. They allege that Gaither was obligated under a contract with UOM until December 31, 2018, and that UOM continued to pay him pursuant to the terms outlined above. ECF 21 ¶¶ 175, 321, 325. They also allege that, while under contract with UOM, Gaither hired away event hosts from UOM, accessed

UOM's Inflatable Office ("IO") system, and downloaded contracts to use for his own new FunFlicks company, NATJAY, LLC. *Id.* ¶¶ 173-182, 326. As a result of Gaither's alleged breach, Plaintiffs claim $135,574.40 of lost profits in the Maryland territory. *Id.* ¶ 329. In sum, factual disputes remain as to the precise relationship between the parties vis-à-vis the terms described in the email exchange, whether the email exchange is inclusive of all material terms, and whether Gaither breached those terms.

### F. Counts III and IV – MUTSA and FTSA

In Counts III and IV, Plaintiffs contend that the Defendants violated the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law § 11-1201 *et seq.* (West 2018), and the Federal Trade Secrets Act ("FTSA"), 18 U.S.C. § 1836, by misappropriating "the UOM Mid-Atlantic Client List." ECF 21 ¶¶ 332-378. The Amended Complaint defines the "UOM Mid-Atlantic Client List" as "all of UOM's Client Information for the states of Maryland, Pennsylvania, Delaware, New Jersey, District of Columbia, and Virginia, less the Pre-2013 UOM MDD Client List," which was conveyed from the Severn Defendants to Plaintiffs on January 1, 2013. ECF 21 ¶¶ 22-23. Plaintiffs allege that the UOM Mid-Atlantic Client List "is a trade secret because it derives independent economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use." *Id.* ¶ 335.

The Federal Trade Secrets Act defines "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information," so long as "the owner thereof has taken reasonable measures to keep such information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value

from the disclosure or use of the information." 18 U.S.C. § 1839(3)(A)-(B). MUTSA employs a similar definition, and to state a claim under that act, a plaintiff must allege: "(1) that it possessed a valid trade secret, (2) that the defendant acquired its trade secret, and (3) that the defendant knew or should have known that the trade secret was acquired by improper means." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (citing Md. Code Ann., Com. Law § 11-1201(c)(1)).

Ultimately, the two Counts rise and fall on whether Plaintiffs have sufficiently alleged that the UOM Mid-Atlantic Client List is a trade secret. Maryland courts continue to use, as "helpful guidance," the Restatement of Torts's six-part test to determine a trade secret. *Bond v. Polycycle, Inc.*, 127 Md. App. 365, 372-73, 732 A.2d 970 (1999). The six factors are:

> (1)The extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the employer's] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Allan M. Dworkin, D.D.S., P.A. v. Blumenthal*, 77 Md. App. 774, 781-82, 551 A.2d 947, 950 (1989) (quoting *Space Aero Products Co. v. R.E. Darling Co.*, 238 Md. 93, 110, 208 A.2d 74 (1965)). In Plaintiffs' Oppositions to the motions to dismiss, they only address one of these six factors – the extent of measures taken to guard the secrecy of the information. ECF 32 at 23-26; ECF 44 at 9-13; ECF 46 at 10.

In terms of secrecy, Plaintiffs allege steps taken to safeguard the UOM Global Client List. ECF 21 ¶¶ 339-343. They further allege that Gaither did not have access to the UOM Global Client List. *Id.* ¶ 343. Plaintiffs' allegation regarding trade secrets, however, turns on the UOM Mid-Atlantic Client List, not the UOM Global Client List. Moreover, although Plaintiffs make

some allegations about "independent contractor agreements with confidentiality provisions," *id.* ¶¶ 347, 348, Plaintiffs do not allege that Gaither was under contractual obligation to maintain the confidentiality of UOM's customer information at the time that the alleged events took place.

This case, therefore, is very similar to *Dworkin*, in which the Court of Special Appeals of Maryland relied heavily on two factors: 1) the fact that the patient list "was developed as an incident of the practice" and was not the result of "an extraordinary amount of effort or money" expended by the Plaintiff, and 2) the fact that "there were no rules, regulations, or known procedures which restricted the availability of the patient information only to select persons." 77 Md. App. at 782, 551 A.2d at 950. In this case, as alleged, there were procedures restricting the availability of the UOM Mid-Atlantic Client List to select persons, namely Gaither. ECF 21 ¶ 349. However, there is no allegation that Gaither was under any existing obligation to maintain confidentiality of that list, or had any restriction against using the list to compete. *See Dworkin*, 77 Md. App. at 779, 551 A.2d at 949 ("Once the employment relationship is terminated, the employee may solicit his former employer's business absent an enforceable covenant restricting competition, misuse of trade secrets, or misuse of confidential information."). To the extent there is a question in this case about the existence and/or terms of an "employment relationship" between Gaither and UOM, that question is best resolved in the context of the unfair competition claim, not as a trade secret.

In addition, as to the California Defendants and the Severn Defendants, the Amended Complaint contains no specific factual allegations regarding their acquisition, use, or disclosure of the UOM Mid-Atlantic Client List. *See* ECF 21 ¶¶ 353-357 (making general allegations devoid of any facts). The Amended Complaint specifically alleges that Gaither stole, made use of, and disseminated the list. ECF 21 ¶¶ 216, 243, 336. Thus, even if the UOM Mid-Atlantic Client List

were entitled to protection as a trade secret, Plaintiffs would not have stated a viable claim under either MUTSA or the FTSA against the California or Severn Defendants.

### G. Count VI – Defamation

In Count VI, Plaintiffs allege defamation against all of the Defendants. ECF 21 ¶¶ 401-421. In Maryland, to plead defamation, a plaintiff must allege, "that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm." *Gohari v. Darvish*, 363 Md. 42, 54, 767 A.2d 321, 327 (2001) (quoting *Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866, 871 (1992)). The alleged defamatory statement is a February 27, 2018 email written by Gaither ("the Gaither email"), attached as Exhibit 1 to the Amended Complaint. ECF 21 ¶ 27.

Plaintiffs have alleged each of the necessary elements of a defamation claim as to both Gaither and NATJAY. First, the statements made in the Gaither email, as alleged, "falsely accused and or imputed that UOM and Laura engaged in the criminal behavior of fraud and deceit," and the Gaither email was disseminated by Gaither to UOM's Mid-Atlantic Clients. ECF 21 ¶¶ 406, 409; *see also* ECF 31-1 at 22 (Gaither Defendants' Motion to Dismiss conceding the email was "sent by Mr. Gaither"). While Gaither admits to drafting the email, it was written in the third person and was signed by the "FunFlicks Team," which implicates his FunFlicks business, NATJAY. ECF 21 ¶ 242. Plaintiffs have also sufficiently alleged the falsity of the statements in the Gaither email. Specifically, Plaintiffs have disputed the statements that UOM "is attempting to undermine FunFlicks business across America" and that UOM is "not registered to conduct business in Maryland," by alleging that these statements are false, and that, through February, 2018, and during negotiations with FF-Severn, UOM rightfully continued operating as a FunFlicks licensee without objection from the California Defendants, the new FunFlicks brand owners. *Id.*

¶¶ 157, 158.  Finally, Plaintiffs have sufficiently alleged harm as a result of the Gaither email.  For example, they allege the loss of thirty corporate clients from Maryland, representing approximately $43,339.38 in yearly sales, in addition to other loss of business, goodwill and the need to hire a public relations firm to mitigate the damages.  *Id.* ¶¶ 413-420.

In contrast, however, Plaintiffs have made no specific factual allegations linking the California Defendants or the Severn Defendants to the Gaither email.  The Gaither email was sent on February 27, 2018, and thus is within the period where the Severn Defendants are protected by the release.  The mere conclusory allegation that the California Defendants provided "substantial encouragement and assistance" to Gaither, ECF 21 ¶ 415, does not meet the level of specificity required by the pleading standards set forth in *Iqbal* and *Twombly*.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citing *Twombly*, 550 U.S. at 555)).  Thus, Count VI will be dismissed as to the Severn Defendants and the California Defendants, but will remain as to the Gaither Defendants.

### H.  Count VII – Intentional Interference with Contract

In Count VII, Plaintiffs allege intentional interference with their alleged contract with Gaither.  ECF 21 ¶¶ 422-427.  The Court notes that the caption for this count only seeks relief against the "HDS Defendants," but the prayer for relief paragraph also seeks relief from the Severn Defendants.  *Id.* at 104-05.  Taking the allegations in the light most favorable to Plaintiffs, the Court will consider the claim as alleged against both the California Defendants and the Severn Defendants.

To state a claim for intentional interference with a contract in Maryland, a plaintiff must show: (1) a contract existed between plaintiff and a third party; (2) the defendant's knowledge of

that contract; (3) the defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) damages caused by the breach. *Océ North America, Inc. v. MCS Servs., Inc.*, 795 F. Supp. 2d 337, 346 (D. Md. 2011) (citing *havePOWER, LLC v. General Electric Co.*, 183 F. Supp. 2d 779, 784 (D. Md. 2002)); *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 298, 639 A.2d 112 (1994). To show the third element of intentional interference, plaintiff must prove that "the interference was wrongful and without justification." *Océ North America, Inc.*, 795 F. Supp. 2d at 346 (quoting *havePOWER, LLC*, 183 F. Supp. 2d at 784) (internal quotation marks omitted).

The Restatement (Second) of Torts provides guidance to Maryland courts when determining whether the alleged interference was wrongful, considering "the nature of the actor's conduct, the actor's motive, and the interests sought to be advanced by the actor." *Id.* (citing Restatement (Second) Torts § 767). Interference is wrongful if it is "used for the indirect purpose of injuring the plaintiff, or of benefitting the defendant at the expense of the plaintiff." *Id.* (quoting *Sharrow v. State Farm Mutual Auto. Ins. Co.*, 306 Md. 754, 511 A.2d 492, 498 (1986)). Interference may also be wrongful if the conduct includes "conveying to the third person the actor's desire to influence him not to deal with the other." *Id.* at 346-47 (quoting Restatement (Second) Torts § 766, Comment k). This communication need not be a specific request, "so long as the statements have the same effect as if a specific request were made." *Id.*

Plaintiffs contend that the California Defendants "had knowledge that Mr. Gaither was under contract and still working for UOM," and "intentionally interfered with the Gaither/UOM contract by inducing Mr. Gaither to breach his contract with UOM." ECF 21 ¶¶ 423, 424. As discussed above, Plaintiffs have sufficiently alleged that a contract was formed and breached by Gaither, allegedly resulting in damages to Plaintiffs. *See* ECF 21 ¶¶ 317-331. The California

Defendants maintain, however, that "Plaintiffs' failure to allege a wrongful act is fatal to their tortious interference claim." ECF 26-1 at 24. The California Defendants conflate two of Plaintiffs' claims: tortious interference with a contract, and tortious interference with economic relations. The cases the California Defendants cite in opposition to the tortious interference with a contract claim instead apply to a claim for intentional interference with economic relations, which will be addressed below. To show wrongful interference for a tortious interference with contract claim, Plaintiffs need not show "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law," as the California Defendants suggest. *See K&K Mgmt. v. Lee*, 316 Md. 137, 166, 557, A.2d 965, 979 (1989). Rather, the determination of wrongful conduct for this claim "is 'incapable of precise definition,' and must be determined based on the facts and circumstances at hand." *Paccar Inc. v. Elliott Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 694 (D. Md. 2012) (quoting *Macklin*, 334 Md. at 304, 639 A.2d at 120).

Plaintiffs have sufficiently alleged wrongful conduct by the California Defendants by their allegations that the California Defendants assisted Gaither in starting a FunFlicks business in Maryland, despite knowing that he worked for UOM because he had the UOM Mid-Atlantic Client List, which he shared with the California Defendants.

Specifically, Plaintiffs allege that Severn introduced Gaither to the California Defendants to induce Gaither to take over UOM's territory in Maryland. ECF 21 ¶ 177. Subsequently, without Plaintiffs' knowledge, on or about January 30, 2018, Gaither formed NATJAY, LLC to operate a movie business in Maryland. *Id.* ¶ 180. On or about February 5, 2018, while Gaither was still under contract with UOM, the Gaither Defendants signed a licensing agreement with the California Defendants to operate a FunFlicks business in the Maryland territory. *Id.* ¶¶ 164, 182. On or about February 12, 2018, Plaintiffs allege that the California Defendants "started with the unauthorized

copying of content from [FF-Landers's] FunFlicks website and started creating a new FunFlicks website on FF HUNTER/DIAS web/email server." *Id.* ¶ 167.

Throughout this time period, while Plaintiffs and the California Defendants were continuing negotiations over the Maryland FunFlicks territory, Plaintiffs allege that the California Defendants "owed a duty to advise UOM that [the California Defendants] had signed a licensing agreement with [the Gaither Defendants] because Mr. Hunter's statement gave the false impression that [the California Defendants] hadn't decided exactly what to do with the Maryland territory," and "Mr. Hunter and Mr. Dias had already licensed the Territory to Mr. Gaither and NATJAY." *Id.* ¶ 190. In addition, Plaintiffs allege that "[w]hile still working for UOM under false pretenses, Mr. Gaither accessed and stole the UOM Mid-Atlantic Client List using his confidential UOM user name and password and provided the stolen information to the [California Defendants]." *Id.* ¶ 208.

These allegations are sufficient to plead intentional interference with contract, as the Plaintiffs have adequately alleged that the California Defendants attempted to use Gaither's contract with Plaintiffs to their benefit by acquiring Plaintiffs' Mid-Atlantic Client List. *See, e.g.*, *Paccar Inc.*, 905 F. Supp. 2d at 694 (denying motion to dismiss on international interference with contract claim because plaintiffs alleged defendant's "personal involvement in [] efforts, making personal contact with [third party] on several occasions in order to dissuade them from making the deal"). Thus, this claim will survive against the California Defendants. However, the factual allegations underlying the alleged interference occurred before the March 3, 2018 Release. Accordingly, this claim must be dismissed against the Severn Defendants.

## I. Count VIII – Federal Wiretap Act

In Count VIII, Plaintiffs allege that the defendants unlawfully intercepted email communications intended for Plaintiffs in violation of the Federal Wiretap Act, 18 U.S.C. §§ 2511 and 2520.  The Wiretap Act provides that, "[A]ny person who – intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication," or who uses or discloses the contents of any electronic communication obtained through interception, is subject to civil suit.  18 U.S.C. § 2511(1).  "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  Section 2520 allows recovery of damages in a civil action by "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter."  18 U.S.C. § 2520(a).

Plaintiffs' attempt to claim a violation of this statute is, in several respects, trying to force a square peg into a round hole.  First, Plaintiffs' standing to challenge Defendants' collection of these emails is unclear.  Some courts have held that only the sender of a communication can challenge its interception, though other courts have extended standing to both a sender and a recipient.  *Compare Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp.2d 622, 627, 633 (E.D. Pa. 2006) ("The intended recipient of an intercepted communication . . . has no standing to raise claim under [the Pennsylvania Wiretap Act]," rather "that cause of action belongs only to the person with whom the communication originated."); *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, Civil Action No. 07-1029, 2007 WL 4394447, at *4 (E.D. Pa. Dec. 13, 2007) ("Plaintiff has standing to assert claims only with respect to those communications sent by Plaintiff and its employees, not with respect to those communications sent by third parties."), *with Shefts v. Petrakis*, No. 10–cv–

1104, 2012 WL 4049484, at *7 (C.D. Ill. Sept. 13, 2012) ("A recipient of a message has as much of a privacy interest in that message as does the sender. Plaintiff has as much 'standing' to complain of the alleged interception of the messages as do the senders of those messages."). In this case, however, Plaintiffs are neither the senders nor the recipients of the emails in question. As of the dates the emails were sent, Plaintiffs had no remaining right to use the emails associated with the "funflicks.com" domain, and acknowledge that they would never have received those emails even had Defendants not set up a "catch-all" box. *See* ECF 21, Exh. 3. Thus, Plaintiffs' only argument is that they were the "intended recipients," and it is therefore questionable whether they qualify as "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used."

I need not resolve the standing question, however, because even more fundamentally, Defendants' actions do not constitute "interception." Plaintiffs allege that the "device" used by Defendants in this case is the catch-all email address "@funflicks.com." ECF 21 ¶¶ 259-265, 423-434. There can be no legitimate dispute that, as of the date of the settlement agreement, if not before, the California Defendants owned the funflicks.com domain name, and, therefore, the right to control any associated email addresses. *See* ECF 21, Exh. 13. Emails sent to any user at funflicks.com were therefore sent directly to the California Defendants, and none of the Defendants "intercepted" those emails. As of the termination of the license, Plaintiffs had no right to use any email address at the funflicks.com domain, and have no right to control Defendants' future use of those email addresses, unless Defendants' actions violate some other statute or constitute tortious conduct. Moreover, the emails were sent, as addressed, to Defendants' funflicks.com server, and that server is not a "device" used for interception as defined by the Wiretap Act. *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 744 (S.D.

Tex. 2010) ("the drive or server on which an email is received does not constitute a 'device' for purposes of the Wiretap Act").

By way of analogy, the emails sent by UOM's current and former customers to a now-invalid email address are akin to a voice mail left on a system for a number now assigned to a new user, or a letter delivered to a company's former address. The new user of the telephone number or the new resident of the premises does not "intercept" the messages or items simply by virtue of receiving them. Likewise, emails sent to "@funflicks.com" and received by "@funflicks.com," even if the intended individual recipients may not have been privy to continued communications at "@funflicks.com," does not transform the receipt by "@funflicks.com" into an interception. Moreover, the court cannot be in the business of restricting FunFlicks from reusing email addresses formerly used by other licensees. It is not entirely clear, at this stage of the litigation, whether the emails in question were intended to be sent to FunFlicks as a business entity, or to particular employees who are now working at UOM. In fact, Plaintiffs' counsel conceded at the hearing on these motions that, had the Defendants simply "caught" the emails in the catch-all account but not used them, interception would not have occurred. The gravamen of Plaintiff's complaint is not in the simple receipt of the emails sent to "@funflicks.com," but in the use the Defendants made of those emails. Those issues will be addressed with respect to other Counts discussed herein.

The cases Plaintiffs cite do not support their contrary interpretation of the Wiretap Act. In *Sanders v. Robert Bosch Corp.*, 38 F.3d 736 (4th Cir. 1994), the Fourth Circuit considered the question of whether the undisclosed use of a "voice logger" in a corporation's place of business, to record all conversations involving one of its employees, constituted a violation of the Wiretap Act. The *Sanders* court determined that the "voice logger" was not used in the ordinary course of business, because there was no business justification for 24-hour, 7-day per week recording, and

the employees were not notified of the recording. 38 F.3d at 740-42. Plaintiffs argue that *Sanders* stands for the proposition that a company has to have a policy to establish "use in the ordinary course of business," and has to provide notice to those being intercepted. ECF 32 at 13-22; ECF 44 at 13-21. *Sanders* does not contain those holdings, but simply analyzes "use in the ordinary course of business" in a very different factual situation than that presented here. *See Sanders*, 38 F.3d at 740-42. This case does not involve the "covert use of a surveillance device," but simply revolves around which entity has the right to receive emails associated with a trademarked domain name. *See id.* Moreover, this is not an instance of continued interception of communications of existing employees – there would be absolutely no reason for Defendants to describe their intended use of their own email system to former licensees.

Similarly, Plaintiffs' citation to *Warshak v. United States*, 490 F.3d 455, 478 (6th Cir. 2007), *vacated en banc*, 532 F.3d 521 (6th Cir. 2008) (vacated on ripeness grounds), to establish their reasonable expectation of privacy in the email communications, is inapposite. The notion of a "reasonable expectation of privacy" was relevant, in *Warshak*, to determine whether the Government had to get a search warrant to obtain the contents of emails sent to a defendant's former email account, or if the Government could simply obtain a court order pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d). 490 F.3d at 475-76. That question has no bearing on whether this case involves an "interception" of emails or not. Thus, the criminal cases establishing that parties enjoy a reasonable expectation of privacy in emails are not pertinent to the analysis here.

Finally, in *Hall v. Earthlink Network, Inc.*, 396 F.3d 500, 503-05 (2d Cir. 2005), the Second Circuit determined that an internet service provider's (ISP's) continued receipt of emails sent to a defunct email address did not constitute "interception," because the ISP's receipt of those emails

occurred in the ordinary course of business, and was subject to the express exception in 18 U.S.C. § 2510(a). *Earthlink* actually serves to support Defendants' position over Plaintiffs' position. Plaintiffs attempt to distinguish this case on the basis that Defendants had no involvement in or access to the "@funflicks.com" emails in question before the creation of the catch-all account. *See* ECF 32 at 15-16 n.6; ECF 44 at 15-16 n.8. However, once the transfer of rights to the domain occurred, Defendants had the right to receive and collect "@funflicks.com" emails.

Plaintiffs also attempt to distinguish the closer factual scenarios in two cases from other districts: *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, Civil Action No. 07-1029, 2007 WL 4394447, at *4 (E.D. Pa. Dec. 13, 2007); and *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 743 (S.D. Tex. 2010). In *Ideal*, three companies competed in the motions simulator market: Ideal Aerosmith, Inc. ("Ideal"), Carco Electronics ("Carco"), and Acutronic USA, Inc. ("Acutronic"). 2007 WL 4394447, at *1-2. Carco filed for bankruptcy, and Ideal entered into an asset purchase agreement with Carco, pending the bankruptcy sale, hired most of Carco's former employees, and began operating Carco's business and filling its outstanding orders. *Id.* The former Carco employees continued to use their Carco email addresses to conduct transactions during that time. *Id.* Several months later, on February 1, 2005, at an auction conducted by the Bankruptcy Court, Acutronic outbid Ideal and purchased substantially all of Carco's assets, including its facilities, computers, and server. *Id.* at *2. Once Acutronic purchased the assets, Ideal moved all of the former Carco employees out of the former Carco facility, and assigned them new "Ideal" email addresses. *Id.* However, ongoing communications with customers were still sent to the email addresses associated with the Carco domain name. *Id.* Acutronic, as the new owner of the server, obtained and reviewed those emails, some of which contained Ideal trade secrets and confidential business information. *Id.* Acutronic did not disable

the old Carco addresses or forward the messages to the intended recipients. *Id.* The Court concluded that Acutronic's actions did not constitute interception, stating, "Acutronic employed no device to acquire these e-mails, but was merely, as owner of Carco's system, a direct party to the communication. While Ideal complains that Acutronic was not the intended recipient of the communication, that argument has no legal bearing where the communication was nonetheless sent to Carco/Acutronic." *Id.* at *5. That case is on all fours with the instant case, where the recipient of the emails, even if not the intended recipient, cannot be deemed to have taken action or used a device to "intercept" the emails.

Similarly, in *Healix Infusion Therapy, Inc.*, the Court cited *Ideal* for the proposition that "the drive or server on which an e-mail is received does not constitute a device for purposes of the Wiretap Act." 747 F. Supp. 2d at 743 (quoting *Ideal*, 2007 WL 4394447, at *4). In that case, to resolve a prior lawsuit, Defendants agreed to transfer to Plaintiff Healix Infusion Therapy ("HIT") their domain names incorporating the word "helix." *Id.* at 735. After the transfer of the domains, HIT received emails intended for one of the defendants, Dr. Murphy, which automatically arrived in the account HIT had taken over. *Id.* at 743. Dr. Murphy had not provided HIT with a forwarding email address. *Id.* The Court determined that, "[e]mails sent using the helixhealth.org domain name were thus received into the HIT-owned accounts on GoDaddy.com servers, although directed nominally to Defendants. The Court concludes that HIT was thus a direct party recipient of these emails and did not commit a Wiretap Act violation." *Id.* at 744. Likewise, the Severn and California Defendants' receipt of emails that may have been intended for UOM employees, but which were sent to "@funflicks.com" email addresses, did not constitute a violation of the Federal Wiretap Act.

**J.  Count IX – Texas Wiretap**

Plaintiffs' allegations in Count IX of violations of the Texas Wiretap Act, Tex. Civ. Prac. & Rem. Code § 123.001 *et seq.*, have the same deficiencies as the Federal Wiretap Act claims in Count VIII.  The Texas Wiretap Act provides, "A party to a communication may sue a person who: (1) intercepts, attempts to intercept, or employs or obtains another to intercept or attempt to intercept the communication; (2) uses or divulges information that he knows or reasonable should know was obtained by interception of the communication."  Tex. Civ. Prac & Rem. Code § 123.002.

Plaintiffs' only defense of this claim focuses on an argument that this Court should apply Texas substantive law.  ECF 32 at 22; ECF 44 at 21-22; ECF 46 at 12.  A federal court sitting in diversity applies federal procedural law and the substantive law of the state in which the proceeding is brought.  *See, e.g., Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *see also Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); 19 WRIGHT & MILLER, FED. PRACTICE & PROCEDURE § 4501 (3d ed.).  Consequently, federal courts apply the choice-of-law rules of the state in which the court sits.  *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652-53 (4th Cir. 2010).  In tort actions, Maryland courts adhere to the *lex loci delicti* rule, meaning the court will apply the substantive law of the state where the harm occurred.  *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008) (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 925 A.2d 636, 648-49 (2007); *Lab. Corp. of Am. v. Hood*, 395 Md. 608, 911 A.2d 841, 844 (2006); *Philip Morris v. Angeletti*, 358 Md. 689, 752 A.2d 200, 230 (2000).  "Where the events giving rise to a tort action occur in

more than one state, the court must apply 'the law of the State where the injury – the last event required to constitute the tort – occurred.'" *Id.* (quoting *Heffernan*, 925 A.2d at 625; *Hood*, 911 A.2d at 845).

Here, it is unnecessary to decide the choice of law issue. Even if this Court found that the injury occurred in Texas and applied Texas law, Plaintiffs' claim must still fail because they have failed to sufficiently plead the elements required under the Texas Wiretap statute. The Texas Wiretap Act itself requires the party suing to be a "party to the communication." Here, Plaintiffs have not alleged, nor can they allege, that they were a party to any communications sent to email addresses at "@funflicks.com."[7] Accordingly, Count IX will be dismissed.

## K. Count X – Lanham Act (false designation of origin)

In Count X, Plaintiffs allege a violation of the "false designations of origin" subsection of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). That subsection prohibits use of a "device" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). The test for a false designation of origin is "essentially the same as the test for trademark infringement." *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 327 (D. Md. 2017). To establish trademark infringement under the Lanham Act, a plaintiff must show:

> (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred "in commerce"; (4) that the defendant used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers.

---

[7] It should be noted that Darrell Landers, who is not a Plaintiff in this case, sent an email to "darrell@funflicks.com," posing as a client seeking FunFlicks services, and Darrell Landers received a response from Severn. ECF 21 ¶¶ 269, 270, 271 Exh. 14. However, Plaintiffs do not allege that they were a party to that email.

*People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125(a); *Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 930 (4th Cir. 1995)).

This case is not properly couched as an example of trademark infringement, because the rights to the use of the trademark passed from UOM, as a former licensee, to the Gaither Defendants and the current licensees. Thus, the Defendants' ongoing use of the FunFlicks mark and its associated domain and emails does not constitute a false designation of origin. The origin of the communications is "Funflicks," but Plaintiffs' business, now operating as UOM, is no longer associated with "Funflicks." Plaintiffs allege that "Defendants' interception of the UOM FunFlicks emails creates a false impression that the UOM customer was contacting UOM." ECF 21 ¶ 471. However, the Defendants, as FunFlicks, never falsely represented to customers that they were UOM, and never misused the FunFlicks mark at a time when they were not entitled to use it. While Plaintiffs' allegations sufficiently state a claim for the less defined tort of unfair competition, as set forth below, the allegations do not sound in trademark infringement such that they state a false designation of origin claim under the Lanham Act.

### L. Count XI – Lanham Act (false designation of origin – Gaither email)

Plaintiffs also allege a Lanham Act violation for false designation of origin regarding the Gaither email. However, for the same reasons that Count X fails, the notion of false designation of origin is untenable. While there may be other legal claims involving the representations made in the Gaither email, as discussed above, Gaither properly identifies his company as "FunFlicks" and expressly distinguishes, rather than conflates, his company from UOM. *See* ECF 21, Exh. 1. The Gaither email bears a "FunFlicks" trademark and states, "a prior defaulted business owner has deceitfully marketed as FunFlicks®, sent invoices and confirmed events using multiple aliases

including ultimate outdoor movies and ultimate outdoor entertainment," and "James Gaither is your local Maryland FunFlicks® business owner." *Id.* Plaintiffs cannot plausibly allege that this email creates confusion as to its source – a FunFlicks licensee. Accordingly, this claim will be dismissed against all of the Defendants.

### M. Count XII – Lanham Act (false advertisements – Gaither email)

Count XII presents a viable use of the Lanham Act in this case. Plaintiffs allege that the Gaither email "constitutes a commercial advertisement/promotion containing false or misleading statements about UOM and NATJAY's services which deceives or has the tendency to deceive a substantial segment of the Defendants' audience." ECF 21 ¶ 487. Section 1125(a)(1)(B) of the Lanham Act applies to a person who "uses in commerce any word, term, name, symbol, or device…, which - …in commercial advertising or promotion, misrepresents the nature, characteristic, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

To state a claim for false advertising under the Lanham Act, a plaintiff must show:

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product that
(2) is material and
(3) actually deceives or has the tendency to deceive a substantial segment of its audience
(4) after being placed in interstate commerce,
(5) causing the plaintiff injury.

*First Data Merchant Services Corp. v. SecurityMetrics, Inc.*, 672 Fed. App'x 229, 234 (4th Cir. 2016) (citing *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011)). To establish the first element, a plaintiff must establish that the "advertisement is either (a) literally false or (b) literally true but likely to mislead or confuse consumers." *Id.* (citing *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997)).

As to both Gaither and NATJAY, Plaintiffs have sufficiently alleged that the Gaither email constitutes a commercial advertisement or promotion for FunFlicks that contains false or misleading statements about Plaintiffs' right to operate as a FunFlicks licensee. ECF 21 ¶ 487, Exh. 1. Assuming, as is required at this stage, that all allegations in the Amended Complaint are true, Plaintiffs have also alleged that the Gaither email contained specific falsehoods, and that such falsehoods caused economic and reputational injury to Plaintiffs. ECF 21 ¶¶ 401-421. For example, Plaintiffs allege that the Gaither email's statements, referring to UOM as a "prior defaulted business owner" and that UOM "deceitfully" confirmed events using various aliases, are false. *Id.* ¶ 405. In addition, Plaintiffs specifically allege that the Gaither email resulted in a 42 percent decrease in their sales and profits. *Id.* ¶ 413. Accordingly, this claim will remain as to both Gaither and NATJAY, because the Gaither email promoted Gaither as "the only person in MD/DC/DE/NJ that represents FunFlicks®," based on his FunFlicks licensed business, NATJAY. Plaintiffs have adequately alleged that Gaither sent the email "on behalf of NATJAY," and that the Gaither email "caused UOM's prior customers to go to NATJAY." *Id.* ¶¶ 403, 414.

However, Plaintiffs have failed to state a Lanham Act claim for false advertising against the Severn Defendants and California Defendants, because there are no specific factual allegations tying them to the Gaither email. The Gaither email was sent on February 27, 2018, and thus is within the period where the Severn Defendants are protected by the release. Moreover, the mere conclusory allegation that the California Defendants provided "substantial encouragement and assistance" to Gaither, ECF 21 ¶ 415, does not meet the level of specificity required by the pleading standards set forth in *Iqbal* and *Twombly*. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citing *Twombly*, 550 U.S. at 555)). Accordingly, Count XII survives only as to the Gaither Defendants.

### N.  Count XIII – Unfair Competition

In Count XIII, Plaintiffs allege that the actions of all Defendants constitute unfair competition under Maryland law.  ECF 21 ¶¶ 498-502.  There are no specific elements to establish the tort of unfair competition.  Instead, "each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception."  *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943).  Thus, a court analyzes the particular facts of each case to determine whether a defendant's acts amount to unfair competition.  In general, "[u]nfair competition is 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.'"  *Thompson v. UBS Financial Servs., Inc.*, 443 Md. 47, 60, 115 A.3d 125, 133 (2015) (quoting *Balt. Bedding Corp. v. Moses*, 182 Md. 229, 237, 34 A.2d 338, 342 (1943)).  Maryland courts have suggested that the essential element is "deception, by means of which the goods of one dealer are passed off as the goods of another, and the seller receives the profit which he would not have received except for such deception."  *GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.*, 27 Md. App. 172, 192 (1975).  However, "in cases of unfair competition, fraudulent intent is not essential…."  *Edmondson Village Theatre v. Einbinder,* 208 Md. 38, 46, 116 A.2d 377, 381 (1955).

Here, accepting all allegations in the Amended Complaint as true and drawing all inferences in Plaintiffs' favor, Plaintiffs have stated a plausible claim of unfair competition against each Defendant.  The factual allegations underlying Plaintiffs' claim focus on Defendants' conduct relating to the post-March 3, 2018 "interception" of emails sent to the email addresses formerly belonging to individuals and accounts now associated with UOM.  Plaintiffs allege that the Defendants' redirecting of emails intended for Plaintiffs was done with the purpose of inflicting

"financial harm on UOM for purposes of greed and profit and to destroy competition."  ECF 21 ¶ 137(m).

The allegations relating to those emails involve all of the Defendants.  Plaintiffs have alleged that the California Defendants and the Severn Defendants each had access to the catch-all email account, and that approximately 5,719 emails allegedly intended for Plaintiffs were forwarded to Gaither, which Plaintiffs allege resulted in substantial revenue for Defendants.  ECF 21 ¶¶ 256-278.  In addition, Plaintiffs allege that Severn obtained and authored the response to the "customer" email actually sent by Darrell Landers, while Gaither responded to the email sent by Meghan, an actual customer.  *Id.* ¶¶ 269-271, 274-276.  Plaintiffs also allege unfair competition by Gaither while he was allegedly under contract with UOM, and "was able to steal the UOM Mid-Atlantic Client List, and then send out the Gaither Defamatory Statement to UOM's clients."  *Id.* ¶ 394.  Finally, Plaintiffs allege that Hunter incorporated a company in California with the name "Ultimate Outdoor Movies, Inc." on or about May 22, 2018, "further confus[ing] the Ultimate Outdoor Movies name with FunFlicks."  *Id.* ¶¶ 279-282.

Plaintiffs' specific factual allegations suffice, at this stage of the litigation, to state a claim for unfair competition against each of the Defendants for allegedly receiving profit intended for UOM.  *See, e.g.*, *Sprint Nextel Corporation v. Simple Cell Inc.*, 248 F. Supp. 3d 663, 686-87 (D. Md. 2017), *appeal docketed*, No. 18-1729 (4th Cir. June 29, 2018) (finding genuine disputes of material fact on unfair competition claim as to whether defendants acted to exclude plaintiff from the marketplace or "damage" plaintiff as a competitor); *Farm Fresh Direct Direct By a Cut Above LLC v. Downey*, Civil Action No. ELH-17-1760, 2017 WL 4865481, at *10-11 (D. Md. Oct. 26, 2017) (denying motion to dismiss unfair competition claim because plaintiff alleged facts showing that defendant "contacted plaintiff's 'meat supplier'  and has retained lists of plaintiff's 'providers

and clients'….attempting to 'reap where [plaintiff] has sown.'") (internal citations omitted);

*Translucent Communications, LLC v. Americas Premiere Corp.*, Civil Action No. WGC-08-3235, 2010 WL 723937, at *22-23 (D. Md. Feb. 24, 2010) (granting plaintiffs summary judgment on unfair competition based on defendants' "seizing control of [plaintiff's] domain name by claiming to be the registrant and then redirecting all internet traffic for [plaintiff's] domain name to Defendant['s] domain name"). Accordingly, the Defendants' motions to dismiss Count XIII will be denied.

### O. Count XIV – Intentional Interference with Economic Relations

In Count XIV, Plaintiffs allege that the Defendants intentionally interfered with their contractual and business relationships with their existing clients. Intentional interference with economic relations claims require allegations of:

> (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[ ] in [his] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Kramer v. Mayor and City Council of Baltimore*, 124 Md. App. 616, 637 (1999) (quoting *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 71 (1984) (alterations in original)). "The right to be free from interference with prospective economic advantage is broader than the right to be free from interference with contractual relations, as this right 'exists where no contract or a contract terminable at will is involved.'" *Putsche v. Alley Cat Allies, Inc.*, Case No. PWG-17-255, 2018 WL 784615, at *15 (D. Md. Feb. 8, 2018) (quoting *Oce N. Am., Inc. v. MCS Servs., Inc.*, 795 F. Supp. 2d 337, 348 (D. Md. 2011)). The wrongful interference must be "conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994). Such conduct includes "common law torts and 'violence or intimidation,

defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" *Id.* (quoting *K&K Management v. Lee*, 316 Md. 137, 166, 557 A.2d 965, 979 (1989) (internal quotation marks omitted)).

Defendants quite appropriately suggest that, by this point in the Amended Complaint, Plaintiffs provide very little explicit factual support for their rather conclusory allegations. ECF 21 ¶¶ 504-513. Nevertheless, more than 500 paragraphs into the Amended Complaint, and with each of those paragraphs re-alleged and incorporated, *id.* ¶ 503, it is abundantly clear that Plaintiffs' Amended Complaint, read as a whole, contains sufficient allegations to support this cause of action. The same facts relevant to Count VI of defamation and Count XIII of unfair competition are relevant here. Gaither's alleged defamatory email, sent to Plaintiffs' existing clients, is a sufficient basis to state a claim of intentional interference with economic relations against Gaither. ECF 21 ¶¶ 406-420. In addition, as discussed above, there are sufficient facts alleged as to all of the Defendants relating to the redirection of emails intended for Plaintiffs to the Gaither Defendants, occurring after the March 3, 2018 Release, and allegedly causing financial and reputational harm to Plaintiffs. *Id.* ¶¶ 269-271, 274-276. Plaintiffs have also specifically alleged the redirection of approximately 5,719 emails as a result of the Defendants' conduct. *See id.* ¶ 278.

These allegations suffice to state a claim for intentional inference with Plaintiffs' economic relations. *See, e.g.*, *De Simone v. VSL Pharmaceuticals, Inc.*, Civil Action No. TDC-15-1356, 2018 WL 7199627, at *1 (D. Md. Feb. 1, 2018) (denying motion to dismiss intentional interference claim because plaintiff sufficiently alleged the loss of "specific opportunities and customers . . . as a result of the [defendant's] interference, and that [plaintiff] has therefore been damaged in its

business"); *De Simone v. VSL Pharmaceuticals, Inc.*, Civil Action No. TDC-15-1356, 2017 WL 66323, at *9 (D. Md. Jan. 15, 2017) (denying motion to dismiss intentional interference claim based on plaintiff's allegations that defendant "deliberately used false statements and engaged in other forms of unfair competition in order to poach [plaintiff's] customers"); *Paccar Inc.*, 905 F. Supp. 2d at 695 (denying motion to dismiss intentional interference claim based on plaintiff's allegations of "encouraging [third party] to disregard proposed deals with [plaintiff] and only deal with" defendant). Accordingly, the Defendants' motions to dismiss Count XIV will be denied.

### P. Count XV – Civil Conspiracy

Plaintiffs allege that all of the Defendants conspired to destroy UOM's business by diverting customers, monies, business revenues, and business opportunities away from UOM. ECF 21 ¶¶ 514-522. To establish civil conspiracy in Maryland, a plaintiff must show: (1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act itself not illegal; and (3) actual legal damage resulting to the plaintiff. *Lloyd v. General Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 286 (2007). Civil conspiracy is "not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Haley v. Corcoran*, 659 F. Supp. 2d 714, 716 (D. Md. 2009). Proof of a civil conspiracy claim may be in the form of circumstantial evidence, established "by inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relation of the parties, their motives and all the surrounding circumstances preceding and attending the culmination of the common design." *Great American Ins. Co. v. Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 643 (D. Md. 2014) (quoting *Daugherty v. Kessler*, 264 Md. 281, 286 A.2d 95, 101 (1972) (internal quotation

marks omitted)).  Indeed, "a plaintiff need only allege facts that 'the parties were acting together understandingly in order to accomplish' the wrongful act." *Largie v. Gerres*, Civil No. WDQ-11-2765, 2012 WL 1965450, at *6 (D. Md. May 30, 2012) (quoting *Lloyd*, 397 Md. at 154).

Defendants contend that this count should be dismissed because it must be premised on a tortious wrong, and Defendants are of the view that no tort took place.  ECF 26 at 35; ECF 29-1 at 29; ECF 31-1 at 27.  However, because Plaintiffs' claims relating to the torts of unfair competition and intentional interference with economic relations survive the motion to dismiss for the reasons described above, those torts, if proven, could constitute bases for the claim of civil conspiracy. *See Lloyd*, 397 Md. at 154-56 (plaintiffs' allegations regarding the existence of an agreement amongst the parties to commit tortious acts sufficed for the claim to proceed at early stage); *see also Moawad v. Rogero*, Civil Action No. PX-17-2257, 2018 WL 2431885, at *3 (D. Md. May 30, 2018) (dismissing civil conspiracy claim because plaintiffs failed to aver how defendants knew each other and whether they had ever spoken); *Great American Ins. Co.*, 73 F. Supp. 3d at 643 (finding plaintiff alleged sufficient facts that defendants facilitated the unlawful conversion of property under a common understanding).  Accordingly, the Defendants' motions to dismiss Count XV will be denied.

## IV.    Conclusion

For the reasons set forth above, I shall grant in part and deny in part the Severn Defendants' Motion to Dismiss, ECF 29, the Gaither Defendants' Corrected Motion to Dismiss, ECF 31, and the California Defendants' Motion to Dismiss, ECF 26.  A separate Order follows.


Dated: May 8, 2019                                        _____/s/_____

                                                                    Stephanie A. Gallagher
                                                                    United States Magistrate Judge